# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| JAMES DWIGHT PAVATT, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | Case No. CIV-08-470-R |
| | ) | |
| ANITA TRAMMELL, Warden, | ) | |
| Oklahoma State Penitentiary, | ) | |
| | ) | |
| Respondent.[1] | ) | |

## MEMORANDUM OPINION

Petitioner, James Dwight Pavatt, a state court prisoner, has filed a Petition for a Writ of Habeas Corpus seeking relief pursuant to 28 U.S.C. § 2254. Doc. 49.[2] Petitioner, who is represented by counsel, is challenging the convictions entered against him in Oklahoma County District Court Case No. CF-2001-6189. Tried by a jury in August and September of 2003, Petitioner was found guilty of Murder in the First Degree (Count 1) and Conspiracy to Commit a Felony (Count 2). Finding that the murder was committed for remuneration or the promise of remuneration and that it was also especially heinous, atrocious, or cruel, the jury sentenced Petitioner to death on Count 1. On Count 2, the jury set punishment at ten years imprisonment and a $5,000.00 fine (O.R. XI, 2045-46, 2062-63; O.R. XII, 2249-51).

---

[1] Pursuant to Fed. R. Civ. P. 25(d), Anita Trammell, who currently serves as warden of the Oklahoma State Penitentiary, is hereby substituted as the proper party Respondent in this case.

[2] Doc. 49 is actually the amended petition. The amended petition was filed to correct the original petition, Doc. 42, which was inadvertently filed without the signature of counsel.

Petitioner has presented fifteen grounds for relief. Doc. 49. Respondent has responded to the Petition and Petitioner has replied. Docs. 69 and 73. In addition to his Petition, Petitioner also filed motions for discovery and an evidentiary hearing, to which multiple responses, replies, and further supplemental pleadings have been filed. Docs. 43, 55, 70, 74, 78, 85, and 86. After a thorough review of the entire state court record (which Respondent has provided), the pleadings filed herein, and the applicable law, the Court finds that, for the reasons set forth below, Petitioner is not entitled to his requested relief.

## I. Procedural History.

In Case No. D-2003-1186, Petitioner appealed his convictions and sentences to the Oklahoma Court of Criminal Appeals (hereinafter "OCCA"). In a published opinion, Pavatt v. State, 159 P.3d 272 (Okla. Crim. App. 2007), the OCCA affirmed. Petitioner sought review of the OCCA's decision by the United States Supreme Court. His petition for writ of certiorari was denied on February 19, 2008. Pavatt v. Oklahoma, 552 U.S. 1181 (2008). Petitioner also filed two post-conviction applications, both of which the OCCA denied. Pavatt v. State, No. PCD-2009-777 (Okla. Crim. App. Feb. 2, 2010) (unpublished); Pavatt v. State, No. PCD-2004-25 (Okla. Crim. App. Apr. 11, 2008) (unpublished).

## II. Facts.

On November 20, 2001, Rob Andrew was shot and killed in the garage of the Oklahoma City home he had once shared with his wife, Brenda Andrew. Rob and Brenda had been separated for a couple of months and divorce proceedings were underway. Rob had

come to the marital home that Tuesday evening to pick up his kids[3] for the upcoming Thanksgiving holiday. According to Brenda, who also suffered a gun shot wound that evening, she and Rob were both shot by two masked assailants who confronted them in the garage and then fled. However, Brenda's unusual behavior and version of the event were immediate indicators to police that there was more to the story. Events, both before and after Rob's death, showed that Brenda wanted Rob dead so that she could collect his $800,000 life insurance policy and she enlisted Petitioner to help her carry out her plan. Petitioner was not only the Andrews' insurance agent but Brenda's lover.

Petitioner and the Andrews attended the same church, and Petitioner and Brenda taught a 5th and 6th grade Sunday School class together. It is not surprising then that it was at church where relationship issues first came to light. Church members noticed Brenda dressing inappropriately and acting inappropriately with Petitioner, who was also married at the time.[4] As a result, on September 19, 2001, Petitioner and Brenda were asked by church leaders to step down from their teaching positions. Both Petitioner and Brenda were upset by this. Brenda was upset that Rob would not defend her and/or leave the church over it. Petitioner felt that Rob was involved behind the scenes. Right after it happened, Petitioner, referring to Rob, told a church member, "I hate the son of a bitch" (J. Tr. VI, 1538).

---

[3] Rob and Brenda had a daughter, Tricity, age 10, and a son, Parker, age 7.

[4] Petitioner filed for divorce on August 21, 2001, and the divorce was granted September 6, 2001.

In late September 2001, Brenda kicked Rob out of the house and he moved into an apartment. The day after he moved out, Rob told a close friend that he was afraid that Brenda had finally found someone to kill him and that someone was Petitioner.[5] Shortly thereafter, Brenda filed for divorce. Even though it was apparent that Brenda was being unfaithful and Rob knew that she had been unfaithful to him before,[6] Rob continued to express his love for Brenda and maintained the hope that they could reconcile. In the divorce, the two most troublesome issues were custody of the kids and Rob's $800,000 life insurance policy. Brenda was very possessive of the kids and did not want Rob to have any relationship with them. Regarding the life insurance policy, Brenda was adamant that she remain the designated beneficiary.

After Rob moved out and the divorce was underway, the relationship between Petitioner and Brenda was much more transparent. A next door neighbor recalled seeing Petitioner's truck at the Andrew residence with increased frequency. In fact, it was particularly common to see Petitioner's truck in the Andrew driveway shortly after Brenda had put the kids on the school bus. Petitioner, who had told his adult daughter, Janna Larson,

---

[5] While this comment may have seemed outlandish, on September 1, 2001, a plumbing contractor working in the Andrew home overheard Brenda tell Rob that "she was going to have him fucking killed" (J. Tr. VII, 1831). In addition, Petitioner, who had served in the military, was often heard to brag about his involvement in top secret missions. Petitioner indicated that he was a sniper, an expert marksman, and that he used to kill people for a living.

[6] Norman Nunley and James Higgins, two men with whom Brenda had previously been involved, testified at trial about their prior sexual involvement with Brenda during her marriage to Rob. Mr. Nunley testified that his relationship with Brenda lasted for about three to six months in late 1997 and early 1998. Mr. Higgins testified that his relationship with Brenda lasted for over a year from about March 2000 to May 2001.

that he was having a sexual relationship with Brenda, later told her of his plans to marry Brenda and have a child with her. Meanwhile, Brenda continued to relay her hatred for Rob. Mr. Higgins, one of Brenda's former paramours, testified that after the divorce was filed, Brenda told him that she wished Rob would just die so she could get the money and go on with her life.

On October 26, 2001, someone cut the brake lines to Rob's car. Rob noticed a problem with the brakes when he first got into the car and he took it straight to the dealership. The dealership confirmed that his brake lines had in fact been cut. Rob called 911 from the dealership to report what he believed was attempted murder. That morning, Rob received three phone calls, one on his cell phone and two at work. In all three calls, he was told that he needed to get Norman Regional Hospital as soon as possible because Brenda and/or his family were there.[7] Petitioner's daughter, Janna, admitted to making two of the phone calls at the request of Petitioner. After listening to the third call, Janna told police that she believed it was her dad disguising his voice. Twice, once before Rob's death and once after, Petitioner told Janna to never tell anyone about making those phone calls to Rob. Also, Janna testified that around the same time as the brake incident, her father told her that "nuttier than a fruitcake" Brenda had asked him to murder Rob or have someone do it. Janna testified that they both laughed it off and joked about it. However, despite the nature of

---

[7] Detective Barry Niles expressed his belief that the timing and content of the calls made to Rob that morning were related to his brake lines being cut.

Brenda's request and Petitioner's assessment of her mental status, Janna noted that Petitioner continued in his relationship with Brenda.

The brake incident escalated Rob's fear that Petitioner and Brenda were trying to kill him and he immediately began efforts to remove Brenda as the beneficiary of his $800,000 life insurance policy. Rob wanted to make sure that if anything happened to him, the insurance proceeds would go to his children. When Rob asked Petitioner about changing the beneficiary, Petitioner told him he could not change it because he was not the owner of the policy. When Rob went over Petitioner's head and asked Petitioner's boss whether he could change the beneficiary, Rob was told that as of October 26, 2001, he was the owner of the policy and that he could change the beneficiary. When Petitioner found out that Rob had called his boss, he was furious and told Rob, "[I]f you think you have problems with Brenda you haven't seen anything until you messed with me" (J. Tr. VII, 1859-60).

The $800,000 life insurance policy in question was sold to Rob by Petitioner, a Prudential agent, on March 25, 2000. As issued, Rob was the owner and the insured, Brenda was the primary beneficiary, and the Andrew children were the contingent beneficiaries. Although both Petitioner and Brenda asserted that the ownership of the policy had been changed to Brenda on a Prudential form dated March 22, 2001,[8] Prudential's corporate office

---

[8] The State's evidence questioned the authenticity of the March 22, 2001, change of ownership form. First, the Contact History Log, a document maintained by Petitioner in his client file for Rob, not only appeared altered, but inconsistent with the date the alleged ownership change occurred. In addition, consistent with Brenda's belief that she could sign Rob's name better than he could, the State presented evidence that Rob's signature on the form was a forgery.

never received the original form.[9]  Although Rob ultimately wanted to change the primary beneficiary to his brother as trustee of a trust for the benefit of his kids, the matter was at least temporarily resolved by a temporary order entered in the divorce case on November 1, 2001.  Per court ruling, the kids were to be named the primary beneficiaries with Brenda as the designated trustee.[10]

On November 20, 2001, Rob was looking forward to picking up his kids and spending the long Thanksgiving holiday weekend with them.  Although Rob had also hoped to do some quail hunting that weekend with his brother, his continued efforts to acquire his 16-gauge shotgun from Brenda were unsuccessful.  At 6:00 that evening, Rob sat in the driveway of the marital residence talking on his cell phone to a friend while he waited for Brenda to get the kids ready to go.  When the garage door began to rise, Rob told his friend that he had to go.  Shortly thereafter, shots were fired.

Brenda's first call to 911 was at 6:20 p.m.  In the first call, Brenda reported that she and Rob had been shot in the garage by assailants wearing black masks.  In a second call, which ended at 6:26 p.m., Brenda added that Rob was bleeding a lot, but that he was

---

[9] A faxed copy was sent by Petitioner to corporate on October 29, 2001.  This was the first notice received by Prudential's corporate office about an alleged change of ownership.  State's Exhibits 28 through 32 are tape recordings of conversations between Rob and Prudential corporate representatives, and Brenda and/or Petitioner with Prudential corporate representatives regarding the ownership of the policy.  The conversations began with Rob's call after the brake incident on October 26th.

[10] However, in the search of the Andrew residence after the murder, police found a letter dated November 2, 2001, to Brenda from Prudential which confirmed changes made to the policy.  Per the change, as of November 2nd, Brenda was the owner and sole beneficiary.  No contingent beneficiary was named.

conscious, breathing, and trying to talk. When police arrived, Rob's car was in the driveway, the garage door was up, Brenda's van was in the garage, Rob was lying on the garage floor in a pool of blood, and Brenda was sitting about three feet away from Rob in the doorway between the garage and the house. The Andrew children were found in the back bedroom, the room furthest from the garage. The bedroom door was shut and the TV was on, with the volume raised to a very uncomfortable level.

Brenda was taken out of the garage to the curb to be treated and questioned. Brenda told police at the scene that there were two armed assailants wearing black masks and black clothes. The assailants said six or seven words, but Brenda could not remember what they were. The assailants fled the seen on foot. Oklahoma City Police Officer Roger Frost, a 17-year patrolman who had responded to several hundred crime scenes and twenty to thirty homicides, was one of the first officers to arrive at the scene. He described Brenda's behavior that evening as strange. She was not hysterical, as is usually the case. Instead, Officer Frost testified that she was very calm and able to answer his questions straight on. Her crying appeared fake.

Brenda was taken by ambulance to the emergency room, where she was treated for her injury, a single gunshot wound to the back of her left arm. Officer Frost followed Brenda to the hospital, and Oklahoma City Police Officer Theresa Bunn met them there. At the hospital, Brenda remained very calm. Similar to Officer Frost's assessment, Officer Bunn described Brenda's behavior as bizarre and fake. Officer Bunn thought Brenda's responses were more of a theatrical production. As questioning continued, Brenda's description of the

event and the assailants remained fairly the same. Officer Frost thought it was strange that Brenda could not remember the particular words the assailants said. She had no specifics on the weapons they had either, even though her wound appeared to have been inflicted at close range. Brenda did add that Rob was in the garage lighting the pilot light to the heater because it had gone out, and she recalled the assailants grabbing Rob's pants. When asked what she did after the shots were fired, Brenda said she went into the kitchen to get the phone to call 911, checked on the kids in the bedroom, and then returned to the garage.[11]

Rob died from two shotgun wounds, one to the neck and one to the chest. One spent shotgun shell, a Winchester 16 gauge, was found on top of Brenda's van in the garage. A second spent Winchester 16 gauge shotgun shell was found in the Gigstad residence. The Gigstads lived next door to the Andrew residence. Brenda had a key to the Gigstad residence because she routinely watched their house when they went out of town. The Gigstads were out of town when Rob was killed. Although the murder weapon was never found,[12] the State presented expert testimony that the shell found in the Andrew garage had been fired from the same shotgun as the shell found in the Gigstad residence.

In the door leading from the garage into the house, police also found an embedded metal pellet projectile. Because it was mashed up, its caliber could not be determined at the scene; however, upon expert examination, it was determined to be a .22 caliber. Although

---

[11] The lack of a blood trail, or any blood in the house for that matter, was one of the indications that the crime had been staged.

[12] Rob's 16-gauge shotgun was never found either.

the projectile was too damaged to conclusively determine the manufacturer, the State presented expert testimony that the projectile was consistent with four .22 caliber CCI live rounds collected in the course of the investigation. Three of these live rounds were found in the Gigstads' attic; the fourth was found in the passenger floorboard of Janna's car. Janna testified that Petitioner had her car on the day Rob was killed, and that the next time she drove the car, she saw the bullet in the floorboard. When she called Petitioner to ask him about it, he told her to throw the bullet away and not tell anyone about it. Less then a week before Rob's murder, Petitioner purchased a .22 caliber handgun. Given that Brenda was shot in the back of the arm, it was clear that her wound was not self-inflicted.

The day before Rob's funeral, Petitioner, Brenda, and the Andrew children fled to Mexico. Both Petitioner and Brenda told Janna that they were leaving because they anticipated being arrested for Rob's murder after the funeral. Over three months later, on February 28, 2002, Petitioner and Brenda were taken into custody at the Mexican border. On that same day, Brenda called Mr. Nunley, another one of her former paramours, from the county jail in Hidalgo, Texas. She told Mr. Nunley that she needed his help to get in contact with her attorney. She told Mr. Nunley that there was a confession letter in her children's luggage that she needed to get into the proper hands.

State's Exhibit 222 is a confession letter written to Rob and Brenda's daughter, Tricity, and signed by Petitioner. The State presented expert testimony from a document examiner that the letter was actually written by Petitioner. In the letter, Petitioner takes full responsibility for the planning and implementation of Rob's murder. He describes how he

10

planned the crime and how he enlisted a friend to help him. He states that after his friend shot Rob and he shot Brenda, they ran and hid in the house next door. Petitioner states he admitted his involvement in Rob's murder to Brenda while they were on their trip in Mexico. Petitioner notes that Brenda was shocked, angry, and hurt by his actions, and that she could not understand why he would do it.

Additional facts will be referenced herein as they relate to the individual grounds for relief raised by Petitioner.

## III. Standard of Review.

### A. Exhaustion as a Preliminary Consideration.

The exhaustion doctrine is a matter of comity. It provides that before a federal court can grant habeas relief to a state prisoner, it must first determine that he has exhausted all of his state court remedies. As acknowledged in <u>Coleman v. Thompson</u>, 501 U.S. 722, 731 (1991), "in a federal system, the States should have the first opportunity to address and correct alleged violations of state prisoner's federal rights." While the exhaustion doctrine has long been a part of habeas jurisprudence, it is now codified in 28 U.S.C. § 2254(b). Pursuant to 28 U.S.C. § 2254(b)(2), "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."

## B.    Procedural Bar.

Beyond the issue of exhaustion, a federal habeas court must also examine the state court's resolution of the presented claim.  "It is well established that federal courts will not review questions of federal law presented in a habeas petition when the state court's decision rests upon a state-law ground that 'is independent of the federal question and adequate to support the judgment.'" <u>Cone v. Bell</u>, 556 U.S. 449, 465 (2009) (quoting <u>Coleman</u>).  "The doctrine applies to bar federal habeas when a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement." <u>Coleman</u>, 501 U.S. at 729-30.

## C.    Merits.

In accordance with the Antiterrorism and Effective Death Penalty Act of 1996 (hereinafter "AEDPA"), the Court's authority to grant habeas corpus relief to state prisoners is limited.  When a state prisoner presents a claim to this Court, the merits of which have been addressed in state court proceedings, the Court cannot grant habeas corpus relief upon the claim unless it determines that the state court proceedings resulted in a decision (1) "that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

The focus of Section 2254(d) is on the reasonableness of the state court's decision. To obtain relief, a petitioner must show that the state court decision is "objectively

unreasonable." Williams v. Taylor, 529 U.S. 362, 409 (2000) (O'Connor, J., concurring but delivering the opinion of the Court with respect to Part II).  See Cullen v. Pinholster, 563 U.S. ___, 131 S. Ct. 1388, 1398 (2011) (acknowledging that Section 2254(d) places a difficult burden of proof on the petitioner).  "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable — a substantially higher threshold." Schriro v. Landrigan, 550 U.S. 465, 473 (2007).

"Under § 2254(d), a habeas court must determine what arguments or theories supported . . . the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." Harrington v. Richter, 562 U.S. ___, 131 S. Ct. 770, 786 (2011).  Relief is warranted only "where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents." Id. The deference embodied in Section 2254(d) "reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." Id. (citation omitted).

### IV. Analysis.

#### A. Pretrial Publicity (Ground One).

In his first ground for relief, Petitioner asserts that he was denied due process and his right to an impartial jury due to pretrial publicity.  Petitioner raised this claim on direct

appeal and the OCCA denied it on the merits.[13]  Respondent contends that Petitioner is not entitled to relief because he has failed to show that the OCCA's decision is contrary to or an unreasonable application of Supreme Court law.

On January 8, 2003, Petitioner filed a motion for a change of venue.  In the motion, Petitioner adopted the arguments made in a separate motion filed by Brenda and requested an evidentiary hearing (O.R. IV, 800-01).  In a two-day hearing, held on January 9 and 21, 2003, the defense presented four witnesses in support of their motions.  Three of the witnesses addressed the Oklahoma City media market[14] and the media coverage of the murder.  The fourth witness discussed the results of an opinion poll conducted by the University of Oklahoma at Brenda's request.  The following evidence was presented:

- 1,527[15] stories aired on Oklahoma City's four major television stations[16] from the day of the murder, November 20, 2001, until January 4, 2003 (Defendant's Venue Exhibit 3);

- according to Nielsen Media Research, these 1,527 stories reached a cumulative audience of 81,997,314 (referred to as "gross impressions") (M. Tr. 1/9/03, 134; Defendant's Venue Exhibit 4);

---

[13] In Ground Fifteen, Petitioner presents a related trial counsel ineffectiveness claim.

[14] The purpose of this evidence was to show the geographical span of the media coverage, and in turn, the counties outside of the coverage area which might serve as a suitable venue.

[15] Throughout his pleadings, Petitioner's counsel incorrectly reports this number as 15,027.

[16] This number includes the multiple times a story may have appeared on a single day or even in a single broadcast.  For example, on November 27, 2001, a week after the murder, a total of twenty stories aired.  KFOR ran two stories at 5 a.m., two at 6 a.m., one at noon, and one at 6 p.m.; KOCO ran two stories at 5 a.m., two at 6 a.m., one at noon, one at 5 p.m., one at 6 p.m., and one at 10 p.m.; KOKH ran one story at 9 p.m.; and KWTV ran one story at 5:30 a.m., two at 6 a.m., one at 7 a.m., and one at 5 p.m. (Defendant's Venue Exhibit 3).

- in a telephone poll of 303 Oklahoma County residents conducted in September and October of 2002, 264, or 87%, had heard of the murder and of these 264, 247, or 93%, had heard of the case through the media (M. Tr. 1/9/03, 237; Defendant's Venue Exhibit 7);[17]

- between November 21, 2001, the day after the murder, and October 29, 2002, seventy-four articles appeared in The Daily Oklahoman newspaper and forty of those articles were on the front page (M. Tr. 1/21/03, 26-66, 70);[18] and

- nationally, a story about the murder appeared in the October 2, 2002, edition of People Magazine, twice on America's Most Wanted, and twice on Primetime Thursday (M. Tr. 1/21/03, 75-78; Defendant's Venue Exhibit 17).[19]

In denying a change of venue, the trial court acknowledged the tremendous amount of media attention the case had received, but found that the defendants had not shown "that the minds of the inhabitants of the county . . . [were] so prejudiced against [them] that a fair and impartial trial [could not] be had . . ." (M. Tr. 1/21/03, 105) (referencing Okla. Stat. tit. 22, § 561).  The trial court did not foreclose the possibility, however, that a change of venue might be necessary, but stated that voir dire would be the best opportunity to determine what effect the pretrial publicity had on the jury pool (M. Tr. 1/21/03, 104-08).

---

[17] The majority of the questions asked related to Brenda and are therefore irrelevant here because Petitioner was tried separately.

[18] Defendant's Venue Exhibit 16 was an admitted exhibit containing copies of all of the newspaper articles referenced in the hearing.  It is not a part of the transmitted state court record, and according to Petitioner's counsel, the exhibit was transmitted to the OCCA for Petitioner's appeals but went missing at some point.  Petition, p. 32 n.2.  In his Petition, Petitioner has provided summaries for twenty-seven of the articles which were contained in the missing exhibit.  Petition, pp. 32-38.

[19] The People Magazine article was not admitted at the hearing because it was attached to Brenda's change of venue motion.  However, it is not contained in the original record (O.R. IV, 783-90).  Also, it is apparent from viewing Defendant's Venue Exhibit 17 that the reference to the 20/20 stories made by Brenda's counsel at the hearing is actually a reference to ABC's Primetime Thursday.

On the first day of trial, August 25, 2003, Petitioner filed a motion re-urging his request for a change of venue (O.R. X, 1933-35). In the motion, Petitioner asserted in part as follows:

> 2. Since the airing of an alleged confession letter purportedly written by [Petitioner] one week prior to the Trial set in June, 2003, and the current setting of this matter to begin on August 25, 2003 against [Petitioner], numerous news accounts of various documents and pleadings filed have been presented to the general public on television, on the radio, in print and via the internet, all to the detriment of [Petitioner].

> 3. In addition to the publishing of the above-described letter for the last three (3) months, recently a report of a counselor at the CARE Center has been published in its entirety which documents the interview she held with the children of Defendant Andrew concerning the homicide. This report was publicized on television, on radio, in print and via the internet. All of this pre-trial publicity has prejudiced [Petitioner] from receiving a fair trial in this venue.

(O.R. X, 1933-34). The motion was heard prior to the start of trial. Although defense counsel recounted the most recent publicity, the trial judge noted that she was "very mindful" of it.[20] Standing on its previous ruling, the trial court denied the motion, and the case proceeded to voir dire (J. Tr. I, 51-60, 73).

A review of voir dire reveals that although 100 potential jurors were called into the courtroom, it was necessary to question only sixty-four to seat a jury. Of the sixty-four questioned, eight had never heard about the case. Of the thirty-four that were excused for cause, eighteen were excused due to their inability to consider all three punishment options,

---

[20] The transcript of a motion hearing held the prior month offers further support for the fact that the trial judge, a member of the community herself, was well-aware of the publicity surrounding the case (M. Tr. 7/24/03, 5).

six were excused for publicity reasons, and ten were excused for various other reasons.[21]

With thirty jurors passed for cause, the State and the defense were each given nine peremptory challenges; however, each only exercised eight. The State waived its eighth peremptory challenge and the defense waived its final peremptory challenge. Three members of the jury had never heard about the case (J. Tr. I, 106, 193; J. Tr. III, 852; J. Tr. IV, 929-30, 958), and none of the jurors who had been exposed to the publicity had ever formed an opinion about the case and all affirmed that they could be impartial (J. Tr. I, 101-02, 114, 119-20, 123-24; J. Tr. II, 380-81, 426-27, 562-63, 595; J. Tr. III, 652, 805-06; J. Tr. IV, 970-71).[22]

On direct appeal review of Petitioner's claim, the OCCA found that it lacked merit. The OCCA held as follows:

> We review the trial court's denial of [Petitioner's] motion for change
> of venue for an abuse of discretion. DeRosa v. State, 2004 OK CR 19, ¶ 21,

---

[21] To obtain two alternates, thirteen were questioned. Two of the thirteen had never heard about the case, and of the seven who were excused, none were excused for publicity reasons.

[22] Jurors Chess and Cowns had not read, seen, or heard anything about the case since the arrest (J. Tr. I, 101-02; J. Tr. II, 595; J. Tr. III, 652). Juror Turner had not read, seen, or heard anything about the case for over a year or year and a half (J. Tr. I, 119). Juror Smyth had read, seen, or heard very little and it had been several months since she had (J. Tr. II, 426-27). Juror Weber had read, seen, or heard very little. In fact, she had actually heard more about the case during voir dire than anywhere else (J. Tr. IV, 970). Juror Dawson had last seen something about the case on the news the day before. She recalled hearing about it when it first happened, but only remembered something about Mexico and the border (J. Tr. I, 102; J. Tr. III, 805). Juror Porchay had last read, seen, or heard something about the case a couple of weeks before (J. Tr. I, 114). Juror Helms had last read, seen, or heard something about the case the night before. He stated that he had heard about the case on occasion, but that he did not know the details (J. Tr. I, 123; J. Tr. II, 562). Juror Lewis had last read, seen, or heard about the "gist" of the case about three months before (J. Tr. II, 380-81).

89 P.3d 1124, 1135–36. Pretrial publicity alone does not warrant a change of venue. United States v. McVeigh, 918 F.Supp. 1467, 1473 (W.D.Okl. 1996) ("Extensive publicity before trial does not, in itself, preclude fairness"). The influence of the news media must be shown to have actually pervaded the trial proceedings. Hain v. State, 1996 OK CR 26, ¶ 8, 919 P.2d 1130, 1136. We consider all relevant evidence to determine whether a fair trial was possible at that particular place and time, keeping in mind the ultimate issue: whether the trial court was in fact able to seat twelve qualified jurors who were not prejudiced against the accused. DeRosa, 2004 OK CR 19 at ¶ 19, 89 P.3d at 1135 ("if a trial court denies a defendant's change of venue motion and the defendant is then tried and convicted, the question is no longer about hypothetical and potential unfairness, but about what actually happened during the defendant's trial").

[Petitioner] cites several cases from other jurisdictions where a change of venue was granted, but he offers no analysis as to how those cases are relevant here. [FN4] He also relies on Coates v. State, 1989 OK CR 16, 773 P.2d 1281, where we found error in the trial court's denial of a motion for change of venue. We see no parallels with Coates, however. The defendant in Coates was an elected public official, accused of embezzlement and other crimes directly related to the administration of her office. Therefore, all citizens of the county, and hence every juror, could have perceived themselves as "victims" of the alleged crimes. In fact, two prospective jurors in Coates—at least one of whom actually sat on the jury—had been directly affected by the case because checks they had written to the defendant's office had gone missing. Id. at ¶¶ 14–16, 773 P.2d at 1286–87. Likewise, cases from other jurisdictions have noted that a change of venue may be in order when the community from which the jurors would be drawn may perceive a personal stake in the proceedings. [FN5] [Petitioner] does not argue such facts here, and we find none.

FN4. All but one of the cases [Petitioner] cites are procedurally distinguishable because they involve determinations made before voir dire was even attempted. United States v. McVeigh, 918 F.Supp. 1467, 1470 (W.D.Okl. 1996) (trial court order granting change of venue; prosecution did not dispute the need for a change of venue, and disagreement was only over the more appropriate venue); United States v. Engleman, 489 F.Supp. 48 (D.Mo. 1980) (trial court order granting change of venue); State v. James, 767 P.2d 549 (Utah 1989) (interlocutory appeal on change of venue). The posture of [Petitioner's] case is different. He is raising the issue in the context of a direct appeal

after conviction; and because the ultimate concern is an impartial jury, he must demonstrate that the jury actually empaneled to try him was not impartial. See McVeigh, 918 F.Supp. at 1470 ("Ordinarily, the effects of pre-trial publicity on the pool from which jurors are drawn is determined by a careful and searching voir dire examination"). The fourth case [Petitioner] relies on is State v. Stubbs, 84 P.3d 837 (Utah App. 2004), where an appellate court found reversible error in the trial court's denial of a motion for change of venue. Stubbs, however, is factually distinguishable; the entire county had some 6000 residents, the alleged rape victim was from a locally prominent family, and *voir dire* actually demonstrated that acquaintance with members of the complainant's family and knowledge of the case was pervasive.

[Petitioner] also notes that his alleged confession was reported in the press, which also occurred in Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). But the confession disseminated in Irvin was only one of many factors which worked to deny the defendant a fair trial in that case. These factors resulted in actual prejudice in Irvin, as several jurors admitted that they could not presume the defendant to be innocent of the crime. This record in this case presents no such evidence of prejudice.

FN5. See e.g. McVeigh, 918 F.Supp. at 1470–72 (detailing how local citizenry was affected by bombing of the federal building in Oklahoma City); James, 767 P.2d at 554–55 (giving particular weight to the widespread community participation in the month-long search for the murder victim's body).

From the beginning, this case received more than considerable attention in the local media. That fact cannot be disputed. The case had all the necessary elements to make it ripe for media attention: sex, money, deception, and murder. [Petitioner] refers us generally to the record of the hearing on his change-of-venue motion, but he does not articulate how an air of prejudice pervaded the trial proceedings themselves. Again, our chief concern is not how, or how often, the case played in the media, but whether, at the end of the day, the trial court was able to empanel twelve fair and impartial jurors.

The trial court is entitled to considerable discretion on issues involving jury selection, because it personally conducts *voir dire* and has the opportunity to observe the demeanor of the panelists—so much of which is lost in the transcription of the proceedings. Harris v. State, 2004 OK CR 1, ¶ 11, 84 P.3d

731, 741. The trial court excused a number of prospective jurors who admitted that pretrial publicity had affected their ability to be impartial. On the other hand, several panelists—including at least three who ultimately sat on the jury—said they had heard nothing about the case. Each person who actually sat on [Petitioner's] jury assured the court that he or she could fairly evaluate the evidence, and could consider all three punishment options if [Petitioner] were found guilty. Nowhere in his brief does [Petitioner] claim, much less demonstrate, that any juror actually seated was biased against him due to adverse pretrial publicity. Indeed, defense counsel waived his last peremptory challenge without comment, which we must interpret as satisfaction with the final makeup of the jury. The trial court did not abuse its discretion in denying a change of venue. This proposition is denied.

Pavatt, 159 P.3d at 279-80.

Arguing both presumed and actual prejudice, Petitioner asserts that he should have been granted a change of venue and he seeks de novo review of his claim. Petitioner likens his case to the cases in which the Supreme Court has found a presumption of prejudice, but he also argues the existence of actual prejudice. Although Petitioner acknowledges that voir dire supports a finding that the jurors who actually served could be fair and impartial, he argues that it cannot be relied upon because the trial court "pre-conditioned" the jurors to give "acceptable" answers.

First, the Court finds that AEDPA deference applies to this claim. In an effort to avoid the application of AEDPA deference to his claim, Petitioner advances two arguments. One, he contends that the OCCA did not address the presumed prejudice portion of his claim. "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Richter,

131 S. Ct. at 784-85. Petitioner has not overcome this presumption. The OCCA addressed the merits of Petitioner's claim head on, and although it did not parcel out the claim in terms of presumed prejudice and actual prejudice, its analysis, and the cases upon which it relied and discussed, show that the OCCA fully understood and applied federal constitutional principles to the determination of Petitioner's allegation of error. Two, and with reference to both presumed and actual prejudice, Petitioner asserts that the OCCA's decision is not entitled to deference because it never reviewed the publicity which occurred between the change of venue hearing and trial and/or granted him an evidentiary hearing to present this additional publicity which was not presented to the trial court. This argument is clearly misplaced. On direct appeal, appellate counsel presented the change of venue claim as it was raised in the trial court, and the OCCA reviewed the claim as presented. Appellate counsel did not attempt to supplement the record on appeal, seek an evidentiary hearing, and/or argue a claim of trial counsel ineffectiveness with respect to the additional publicity which occurred in the seven months between the January venue hearing and Petitioner's August trial. Thus, contrary to Petitioner's argument, the OCCA did nothing on direct appeal to compromise the deference due its decision under the AEDPA.

It is axiomatic that the constitutional right to a jury includes the empanelment of impartial jurors. However, as the Supreme Court acknowledged in Irvin v. Dowd, 366 U.S. 717, 722 (1961), impartiality does not require a juror to be "totally ignorant of the facts and issues involved."

In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

Id. at 722-23 (citations omitted).

Supreme Court precedent establishes two avenues of relief for pretrial publicity. The first is presumed prejudice. Presumed prejudice cases are rare, found in only three Supreme Court cases dating back to the 1960s. Goss v. Nelson, 439 F.3d 621, 628 (10th Cir. 2006). In those cases, prejudice was presumed because "the influence of the news media, either in the community at large or in the courtroom itself, pervaded the proceedings." Murphy v. Florida, 421 U.S. 794, 799 (1975). In Rideau v. Louisiana, 373 U.S. 723, 726 (1963), prejudice was presumed because the pretrial publicity created such a "spectacle" that Rideau's subsequent trial was all "but a hollow formality." In Estes v. Texas, 381 U.S. 532, 550-52 (1965), the Court applied Rideau to find a due process violation in the televising and broadcasting of a defendant's trial. In Estes, the press overran the courtroom imposing "a circus atmosphere." Murphy, 421 U.S. at 799; Estes, 381 U.S. at 535-38. Finally, in Sheppard v. Maxwell, 384 U.S. 333, 353-54 (1966), the "massive and pervasive" media attention greatly exceeded the circumstances in Estes. In addition to "extremely inflammatory publicity," the "courthouse was given over to accommodate the public appetite

for carnival." <u>Murphy</u>, 421 U.S. at 799. "The fact is that bedlam reigned at the courthouse during the trial and newsmen took over practically the entire courtroom, hounding most of the participants in the trial, especially Sheppard." <u>Sheppard</u>, 384 U.S. at 355. The Supreme Court found that these circumstances deprived Sheppard "of that 'judicial serenity and calm to which [he] was entitled.'" <u>Id</u> (quoting <u>Estes</u>, 381 U.S. at 536).

As the Supreme Court in <u>Murphy</u> explicitly acknowledged, <u>Rideau</u>, <u>Estes</u>, and <u>Sheppard</u> do not "stand for the proposition that juror exposure to information about a state defendant's prior convictions or to news accounts of the crime with which he is charged alone presumptively deprives the defendant of due process." <u>Murphy</u>, 421 U.S. at 799. Prejudice was presumed in <u>Rideau</u>, <u>Estes</u>, and <u>Sheppard</u> because "[t]he proceedings in [those] cases were entirely lacking in the solemnity and sobriety to which a defendant is entitled in a system that subscribes to any notion of fairness and rejects the verdict of a mob." <u>Murphy</u>, 421 U.S. at 799. Accordingly, the Tenth Circuit, in applying this precedent, has "held that prejudice will only be presumed where publicity 'created either a circus atmosphere in the court room or a lynch mob mentality such that it would be impossible to receive a fair trial.'" <u>Goss</u>, 439 F.3d at 628 (quoting <u>Hale v. Gibson</u>, 227 F.3d 1298, 1332 (10th Cir. 2000)).

> In order to demonstrate that prejudice should be presumed, the defendant must "establish that an irrepressibly hostile attitude pervaded the community." <u>Id.</u> at 1567. "Simply showing that all the potential jurors knew about the case and that there was extensive pretrial publicity will not suffice to demonstrate that an irrepressibly hostile attitude pervaded the community." <u>Id.</u> Presumed prejudice is "rarely invoked and only in extreme circumstances." <u>Id.</u>

<u>Hale</u>, 227 F.3d at 1332 (quoting <u>Stafford v. Saffle</u>, 34 F.3d 1557, 1567 (10th Cir. 1994)).

While Petitioner has shown that the pretrial publicity in his case was significant, he has not shown that his case is one of the rare and extreme cases where the media attention fostered "an irrepressibly hostile attitude." Stafford, 343 F.3d at 1567. Petitioner argues that "[p]rejudice should be presumed because of the frequency and nature of the publicity, and the demonstrated impact this publicity had upon the pool from which the jury was drawn, which ultimately sentenced [him] to death." Reply, p. 5. However, just as he failed to do on direct appeal, Petitioner has not made a connection between the publicity and the fairness of his trial. Supreme Court precedent requires a showing of more than mere exposure, even if that exposure is substantial. To find a presumption of prejudice, the media must have overwhelmingly influenced the community to the point where it was simply impossible to receive a fair trial. Petitioner details the media content and then based on its "frequency and nature," he argues for a presumption of prejudice; however, his argument amounts to no more than an *assumption* of prejudice.[23] Petitioner also asserts that there was a "demonstrated impact" upon the jury pool, but he does not support this statement, and as shown herein, the impact on the jury pool was in fact surprisingly less than expected given that "[t]he case had all the necessary elements to make it ripe for media attention: sex, money, deception, and murder." Pavatt, 159 P.3d at 280.

---

[23] Petitioner does not claim that the publicity was inaccurate, but acknowledges that it relayed the events as they unfolded and was "identical" to much of the State's evidence. Petition, pp. 38, 43, and 47 n.3

In denying Petitioner's claim, the OCCA acknowledged that a change of venue is warranted when "[t]he influence of the news media [has been] shown to have actually pervaded the trial proceedings." Pavatt, 159 P.3d at 279. The OCCA denied relief, however, because Petitioner failed to "articulate how an air of prejudice pervaded the trial proceedings themselves." Id. at 280. For the reasons set forth above, the Court finds that the OCCA's decision is in accord with Supreme Court precedent on presumed prejudice. Petitioner is therefore not entitled to relief on this portion of his claim because he has failed to show that the OCCA's decision is contrary to or an unreasonable application of Supreme Court law.

Beyond presumed prejudice, the Supreme Court has held that a defendant may obtain relief when pretrial publicity causes actual prejudice. Irvin is an actual prejudice case. In Irvin, voir dire spanned four weeks. Irvin, 366 U.S. at 720. From the panel consisting of 430 potential jurors, 370 expressed an opinion about Irvin's guilt, and 268 of the 370 were excused for cause because their opinions were fixed. Of the twelve jurors who actually sat on the jury, eight believed Irvin was guilty before trial even began. Id. at 727. In these circumstances, the Supreme Court held as follows:

> With such an opinion permeating their minds, it would be difficult to say that each could exclude this preconception of guilt from his deliberations. The influence that lurks in an opinion once formed is so persistent that it unconsciously fights detachment from the mental processes of the average man. Where one's life is at stake—and accounting for the frailties of human nature—we can only say that in the light of the circumstances here the finding of impartiality does not meet constitutional standards.

Id. at 727-28 (citation omitted). The Court continued:

No doubt each juror was sincere when he said that he would be fair and impartial to petitioner, but psychological impact requiring such a declaration before one's fellows is often its father. Where so many, so many times, admitted prejudice, such a statement of impartiality can be given little weight. As one of the jurors put it, 'You can't forget what you hear and see.' With his life at stake, it is not requiring too much that petitioner be tried in an atmosphere undisturbed by so huge a wave of public passion and by a jury other than one in which two-thirds of the members admit, before hearing any testimony, to possessing a belief in his guilt.

<u>Id.</u> at 728 (citations omitted).

Petitioner's case is far removed from the circumstances found in <u>Irvin</u>. As previously set forth above, of the 100 potential jurors summoned to the courtroom, it was necessary to question only sixty-four of them to seat a jury. Voir dire was conducted by the trial court, the prosecution, and defense counsel, and of the sixty-four questioned, eight had never even heard about the case, and of the thirty-four that were excused for cause, most (eighteen) were excused due to their inability to consider all three punishment options. Only six were excused for publicity reasons. Thirty jurors were passed for cause, and neither the State nor the defense exercised all of their peremptory challenges. Of the twelve jurors ultimately selected to serve: (1) three had *never* heard about the case; (2) *none* who had been exposed to the publicity had *ever* formed an opinion about the case; and (3) *all* affirmed that they could be impartial. It is for these very reasons that the OCCA denied Petitioner relief. <u>Pavatt</u>, 159 P.3d at 280.

In light of the foregoing circumstances, which in effect undercut Petitioner's claim for actual prejudice, Petitioner is constrained to acknowledge that he "cannot point to a statement by a juror that served that he or she could not be fair and impartial." Reply, p. 11.

However, Petitioner blames the trial court for the lack of evidence supporting his claim by asserting that the trial court "pre-conditioned" the jurors to give "acceptable" answers. Having thoroughly reviewed the voir dire proceedings, the Court cannot agree with Petitioner's characterization. The record reflects that the trial court conducted a thoughtful voir dire in an open and relaxing atmosphere, and there is no indication that potential jurors in any way altered their responses to appease the trial court. The trial court had no reason to seat a partial jury, and the comments which Petitioner draws out from voir dire are more indicative of the positive rapport the trial court developed with the potential jurors than an attempt to solicit less-than-honest responses.

In conclusion, the Court finds that Petitioner is not entitled to relief on his Ground One. Because Petitioner has not demonstrated that the OCCA's ruling on the issue of pretrial publicity is contrary to or an unreasonable application of Supreme Court law, Petitioner's Ground One is hereby denied.

## B. Ineffective Assistance of Counsel: Hearsay (Ground Two).

In Ground Two, Petitioner asserts that his constitutional rights were violated by the admission of hearsay. In support of his claim, Petitioner details thirty-five statements originally made by Rob, Brenda, and Janna as relayed through the testimony of seventeen witnesses. Petitioner also claims that his trial counsel was ineffective for failing to object to all of these statements and that his appellate counsel was ineffective for failing to raise the issue on direct appeal. Respondent asserts that the majority of Petitioner's claim is unexhausted. As to the exhausted portion of the claim, Respondent asserts that Petitioner has

failed to show that the OCCA's decision is contrary to or an unreasonable application of Supreme Court law.  In his Reply, Petitioner (1) re-labels his claim as one of ineffective assistance of counsel only (to be differentiated from a direct evidentiary challenge to the admission of hearsay with appended ineffectiveness claims); and (2) asserts that the claim was fully presented to the OCCA in his first post-conviction application, while acknowledging his filing of a second post-conviction application "[i]n order to make every effort to exhaust meritorious claims."  Reply, p. 22.

No aspect of Petitioner's Ground Two was presented to the OCCA on direct appeal. In his first post-conviction application, Petitioner did claim that his appellate counsel was ineffective for failing to raise the issue of inadmissible hearsay.[24] In that application, Petitioner asserted that his trial was "replete with inadmissible hearsay"; however, he complained only about statements made by Rob and listed as examples only two statements, one Rob made to his friend, Ronald Stump, and another Rob made to his pastor/counselor, Bobby McDaniel.[25]  Original Application for Post-Conviction Relief, No. PCD-2004-25, pp. 61-64.  In denying relief on this claim, the OCCA applied Strickland v. Washington, 466 U.S. 668 (1984), and disposed of the claim on the merits.  Bypassing the deficient performance prong of Strickland, the OCCA found that Petitioner was not entitled to relief

---

[24] In the Reply, Petitioner concedes that the issue presented in his first post-conviction application did not include a trial counsel ineffectiveness claim based on trial counsel's failure to object.  Reply, p. 21 ("Thus, it would be fair to say that the ineffective assistance of trial counsel issue based upon failure to object to the hearsay is unexhausted.").

[25] These are listed in his Petition as numbers 10 and 28.  Petition, pp. 59, 63.

due to the absence of prejudice.  Pavatt, No. PCD-2004-25, slip op. at 3, 7 & n.8.  While the present action was pending, Petitioner returned to state court and filed a second post-conviction application.  In that application, Petitioner presented the OCCA with a hearsay claim that basically mirrored the expanded claim raised in his federal habeas petition.  Second Application for Post-Conviction Relief, No. PCD-2009-777, pp. 1-11.  Finding that the claim was simply a "new slant" on the claim presented in his first post-conviction application, the OCCA declined to entertain the merits of the claim in accordance with Okla. Stat. tit. 22, § 1089(D)(8).  Pavatt, No. PCD-2009-777, slip op. at 3.

In light of the foregoing procedural history, the Court finds that the only portion of Petitioner's Ground Two that is subject to a merits review is that which was presented to the OCCA in Petitioner's first post-conviction application.  The Court finds that the issue presented there was whether appellate counsel was ineffective for failing to raise an evidentiary issue regarding hearsay statements made by Rob, and specifically those two statements made by Rob to Mr. Stump and Mr. McDaniel as identified by post-conviction counsel therein.[26]  While Petitioner argues that the few examples he gave were sufficient to alert the OCCA to the entirety of his claim as presented in his Ground Two, the Court disagrees and finds that the claim Petitioner presented to the OCCA in his first post-

---

[26] In addition to identifying these two statements, post-conviction counsel also presented argument and authority as to why each constituted inadmissible hearsay.  The Court notes that elsewhere within the subproposition, post-conviction counsel did make two more record citations; however, these citations were cited only to show trial counsel's record objections to hearsay.  As neither were supported with argument or authority, the Court finds they were not fairly presented.

conviction application does not encompass any of the following: an ineffective assistance of trial counsel claim; an additional twenty-one statements made by Rob; statements made by Brenda and Janna; or a claim based on Crawford v. Washington, 541 U.S. 36 (2004). It is axiomatic that exhaustion requires fair presentation of a claim to the state courts, and "[t]he rule would serve no purpose if it could be satisfied by raising one claim in the state courts and another in the federal courts." Picard v. Connor, 404 U.S. 270, 275-76 (1971). Accordingly, the Court will first address whether the OCCA's denial of relief under Strickland to Petitioner's claim that his appellate counsel was ineffective for failing to raise an evidentiary issue regarding hearsay statements made by Rob, and specifically those two statements made by Rob to Mr. Stump and Mr. McDaniel, is contrary to or an unreasonable application of Strickland.

Claims regarding the effectiveness of appellate counsel are governed by Strickland. Cargle v. Mullin, 317 F.3d 1196, 1202 (10th Cir. 2003). Thus, in accordance with Strickland, a petitioner alleging appellate counsel ineffectiveness must show (1) that his appellate counsel's actions on appeal were objectively unreasonable and (2) that, but for counsel's unreasonable actions, he would have prevailed on appeal. Smith v. Robbins, 528 U.S. 259, 285-86 (2000); Miller v. Mullin, 354 F.3d 1288, 1297 (10th Cir. 2004). It is clear that the OCCA applied this standard to Petitioner's claim. It is also clear that the OCCA's disposal of Petitioner's claim on the prejudice prong is a sound application of Strickland. Strickland, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which . . . will often be so, that course should

be followed."). The final question then is whether the OCCA's determination fell within the AEDPA's range of reasonableness. The Court easily concludes that it does.

In disposing of Petitioner's claim, the OCCA cited its decision in Brenda's case. Pavatt, No. PCD-2004-25, slip op. 7 n.8. On appeal, Brenda unsuccessfully challenged the admission of many of Rob's statements that were introduced at her trial, including the two statements that Petitioner asserts his appellate counsel should have raised. Regarding Rob's statement to Mr. Stump, the OCCA found that it was clearly admissible as a statement reflecting his current state of mind. Andrew v. State, 164 P.3d 176, 188 (Okla. Crim. App. 2007). As to Rob's statement to Mr. McDaniel, the OCCA also found that Petitioner's threats toward Rob were properly admitted. Id. at 189. Having denied relief in Brenda's case, the OCCA reasonably determined that even if Petitioner's appellate counsel had raised the hearsay issue, Petitioner would not have prevailed on appeal. This conclusion is reasonable, and thus, Petitioner is not entitled to relief on this portion of his claim.

The remaining issues in Petitioner's Ground Two were presented to the OCCA in a second application for post-conviction relief. As previously mentioned, the OCCA declined to entertain the merits of these new issues because, although they were readily available from the trial transcript, they were not presented along with the related claim raised in his initial post-conviction relief application. Pavatt, No. PCD-2009-777, slip op. at 3. The Tenth Circuit has repeatedly recognized the application of a procedural bar to claims which could have been raised in an initial post-conviction application but were not. See Bland v. Sirmons, 459 F.3d 999, 1012 (10th Cir. 2006); Medlock v. Ward, 200 F.3d 1314, 1323 (10th

Cir. 2000); Smallwood v. Gibson, 191 F.3d 1257, 1267 (10th Cir. 1999); Moore v. Reynolds, 153 F.3d 1086, 1096-97 (10th Cir. 1998).

Petitioner asserts, however, that this Court should not recognize the procedural bar applied by the OCCA because it is neither adequate nor independent.[27] Petitioner references Valdez v. State, 46 P.3d 703 (Okla. Crim. App. 2002), and cases in which the OCCA applied it to excuse the application of a procedural bar to claims presented in subsequent applications. However, recent cases from the Tenth Circuit expressly reject Petitioner's arguments. In Black v. Workman, 682 F.3d 880, 914-19 (10th Cir. 2012), and Black v. Tramwell [sic], 485 F. App'x 335 (10th Cir. 2012) (unpublished), cert. denied, ___ U.S. ___, 134 S. Ct. 73 (2013), the Tenth Circuit found that, despite Valdez and the cases applying it, the OCCA's procedural bar to claims presented in a subsequent post-conviction application is both adequate and independent. In addition to Black, two additional cases, Banks v. Workman, 692 F.3d 1133, 1144-47 (10th Cir. 2012), cert. denied, ___ U.S. ___, 133 S. Ct. 2397 (2013), and Thacker v. Workman, 678 F.3d 820, 834-36 (10th Cir. 2012), cert. denied, ___ U.S. ___, 133 S. Ct. 878 (2013), reached similar conclusions. See also Spears v. Mullin, 343 F.3d 1215, 1254-55 (10th Cir. 2003). In light of this authority, Petitioner's Valdez-based attack on the OCCA's application of a procedural bar to his Ground Two issues fails – the OCCA's procedural bar here is adequate and independent.

---

[27] Petitioner's argument is generally asserted in his Preliminary Statement Concerning Procedural Default. Petition, p. 214 & n.11. It is more specifically discussed in his reply and in supplemental pleadings filed thereafter. Reply, pp. 22-26; Docs. 80 and 90.

Having found that the procedural bar applied by the OCCA is both adequate and independent, the Court cannot consider the merits of the remaining issues in Petitioner's Ground Two unless he can satisfy an exception. The first exception, cause and prejudice, requires a petitioner to demonstrate that some external objective factor, unattributable to him, prevented his compliance with the procedural rule in question. Spears, 343 F.3d at 1255. A petitioner must also show that the failure resulted in actual prejudice. Thornburg v. Mullin, 422 F.3d 1113, 1141 (10th Cir. 2005). Petitioner has not made any showing of cause and prejudice to excuse his default of these claims.

The second exception can be met by showing that a fundamental miscarriage of justice will occur if the claim is not heard. The fundamental miscarriage of justice exception addresses those rare instances "where the State has convicted the wrong person of the crime." Sawyer v. Whitley, 505 U.S. 333, 340 (1992). Thus, to meet the exception, a petitioner must make "a colorable showing of factual innocence." Beavers v. Saffle, 216 F.3d 918, 923 (10th Cir. 2000). This requires Petitioner to "show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." Schlup v. Delo, 513 U.S. 298, 327 (1995). "In the specific context of a sentencing challenge, the Supreme Court has held actual innocence requires the petitioner to show 'by clear and convincing evidence that but for constitutional error, no reasonable juror would find him eligible for the death penalty under [state] law.'" Brecheen v. Reynolds, 41 F.3d 1343, 1357 (10th Cir. 1994) (quoting Sawyer, 505 U.S. at 348). See also Black, 682 F.3d at 915-16. Although Petitioner has made a general assertion that he is innocent of both the murder and his death sentence, it falls

woefully short of satisfying this rare exception to the application of a procedural bar, especially in light of the evidence presented against him at trial. Petition, p. 215 & n.12.

In conclusion, Petitioner is not entitled to relief on his Ground Two. Because Petitioner has failed to show that the OCCA's decision denying his appellate counsel claim is contrary to or an unreasonable application of <u>Strickland</u> and because the remaining portion of Petitioner's Ground Two is procedurally barred, relief is unjustified and Ground Two is therefore denied.

### C.    Sufficiency of the Evidence (Ground Three).

In Ground Three, Petitioner challenges the sufficiency of the evidence supporting his murder conviction. Petitioner raised this claim on direct appeal and the OCCA denied relief. Respondent aptly contends that Petitioner has failed to show that the OCCA's determination is contrary to or an unreasonable application of <u>Jackson v. Virginia</u>, 443 U.S. 307 (1979).

<u>Jackson</u> sets forth the familiar standard of review for sufficiency of the evidence claims: "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson</u>, 443 U.S. at 319. As the <u>Jackson</u> Court noted,

> [t]his familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution. The criterion thus impinges upon "jury" discretion only to the

extent necessary to guarantee the fundamental protection of due process of law.

Id. (footnotes omitted).

Judicial review, therefore, is "'sharply limited'" and a reviewing court "must accept the jury's determination as long as it is within the bounds of reason." Boltz v. Mullin, 415 F.3d 1215, 1232 (10th Cir. 2005) (citations omitted). "[T]he Jackson inquiry does not focus on whether the trier of fact made the *correct* guilt or innocence determination, but rather whether it made a *rational* decision to convict or acquit." Herrera v. Collins, 506 U.S. 390, 402 (1993). See also Jackson, 443 U.S. at 318-19 (the question is not whether the reviewing court itself believes that the evidence is sufficient to establish a defendant's guilt beyond a reasonable doubt). Thus, "a federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Jackson, 443 U.S. at 326.

In addition to the deference afforded a jury's verdict by Jackson, the AEDPA adds another layer of deference to the Court's review of a sufficiency claim. As acknowledged by the Supreme Court in Cavazos v. Smith, 565 U.S. ___, 132 S. Ct. 2, 3 (2011) (per curiam),

The opinion of the Court in Jackson v. Virginia, 443 U.S. 307, 99 S. Ct. 2781, 61 L.Ed.2d 560 (1979), makes clear that it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury. What is more, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court

instead may do so only if the state court decision was "objectively unreasonable." Renico v. Lett, 559 U.S. [766], [773], 130 S. Ct. 1855, 1862, 176 L.Ed.2d 678 (2010) (internal quotation marks omitted).

See also Parker v. Matthews, 567 U.S. ___, 132 S. Ct. 2148, 2152 (2012) (referring to habeas review of sufficiency claims as a "twice-deferential standard"); Coleman v. Johnson, 566 U.S. ___, 132 S. Ct. 2060, 2062 (2012) (per curiam) (noting that Jackson claims "are subject to two layers of judicial deference").

In finding that both of Petitioner's convictions[28] were supported by constitutionally sufficient evidence, the OCCA applied Jackson and held as follows:

> [Petitioner] claims there is no "physical evidence" or "forensic evidence" linking him to the crimes. He misapprehends the nature of evidence long held to be admissible and credible in a court of law. A fingerprint at a crime scene may be considered "physical" or "forensic" evidence, though it is not direct evidence of a crime; rather, it is circumstantial evidence from which a jury can infer (in light of other circumstances) that the person with that fingerprint was present and participated in the crime. The same is true of DNA evidence. Both are circumstantial in nature, requiring an inference unnecessary for "direct" evidence, such as a witness's personal observation of a crime. That both fingerprints and DNA can be so compelling as evidence of guilt (or exoneration) attests to the powerful effect circumstantial evidence can have. In fact, classic sources of "direct" evidence—a confession, an eyewitness identification, the testimony of an informant or accomplice—are themselves the subject of special cautionary instructions and corroboration rules. In the end, the law makes no distinction between direct and circumstantial evidence; either, or any combination of the two, may be sufficient to support a conviction. The jury may consider all competent evidence, along with rules of law and basic common sense, in reaching a verdict.

> Although Brenda Andrew was an eyewitness to her husband's murder, the State obviously did not believe that her account of two masked assailants

---

[28] Petitioner notes that any challenge to his conspiracy conviction would be moot because he has already discharged the ten-year sentence he received for that crime. Reply, p. 30 n.2.

was true. The State thus relied on evidence that [Petitioner] and Brenda Andrew had several motives to murder Rob Andrew (money, dissolution of the Andrew marriage, control over the Andrew children), all related to the illicit affair that [Petitioner] never disputed having with Brenda.

But the State's evidence demonstrated much more than motive. There was, in fact, a considerable amount of physical evidence, including bullets, shotgun shells, and forged documents, which linked [Petitioner] to the murder and a pre-existing plan to get away with it. The testimony of Janna Larson, [Petitioner's] daughter, helped to show that [Petitioner] and Brenda had planned to harm Rob Andrew for some time, and that the failure of their first attempt (by cutting the brake lines on his car) only emboldened them. Larson also related a number of incriminating statements from both [Petitioner] and Brenda. Larson may not have been an eyewitness to the murder itself, but she was certainly an eyewitness to many overt acts of the two conspirators, and to their preparations for flight after the murder. The State also presented the letter written by [Petitioner] from jail,[29] wherein he admitted complicity in the murder but attempted to exculpate Brenda. Both parties rejected the letter as an accurate version of what happened, although obviously for different reasons. While the letter may have borne some relevance to show [Petitioner's] complicity, it was perhaps more relevant to show how jealousy and greed can disfigure the human mind. Add to this the numerous other witnesses who spoke with and observed Rob Andrew, Brenda Andrew, and [Petitioner], as their relationships with one another evolved. In short, the evidence against [Petitioner] was largely circumstantial, but that is not unusual in any kind of criminal case. What may be unusual was how large a quantity of circumstantial evidence the State was able to present.

All of the evidence presented at trial, when considered together, formed an intricate web of proof, from which any rational juror could find [Petitioner]

_____

[29] The evidence did not show that the letter was written by Petitioner in jail. Based on a conversation Brenda had with Mr. Nunley after crossing back into the United States from Mexico, Brenda was in possession of the letter at that time (J. Tr. V, 1385-86). Although the OCCA misstated the evidence on this point, this minor misstatement does not show, as Petitioner alleges, that the OCCA failed to give "meaningful consideration" to Petitioner's claim. Petition, p. 77 n.7.

guilty of conspiring to murder Rob Andrew and consummating the murderous plan. The evidence was sufficient to support both of [Petitioner's] convictions.

Pavatt, 159 P.3d at 284-85 (citations omitted) (footnote omitted).

In claiming that the evidence supporting his conviction is lacking, Petitioner argues that his conviction is the result of prejudicial jurors (Ground One), inadmissible hearsay (Ground Two, presented through a claim of ineffective assistance of appellate counsel), inadmissible ultimate opinion testimony (Ground Seven, presented through a claim of prosecutorial misconduct), and evidence erroneously excluded (Ground Four). In addition to this "cumulative error" argument, Petitioner notes the lack of forensic physical evidence connecting him to the murder, and he argues that even if the evidence showed that he wrote the confession letter, he was manipulated by Brenda to write it.

Petitioner's arguments fail to meet the high standard needed to obtain relief on this claim. Based on all of the presented evidence, the OCCA's finding of sufficient evidence is a reasonable application of Jackson. Jackson does not favor one particular type of evidence over another, and so the fact that Petitioner was not linked to the murder by forensic evidence is of no particular consequence. As the OCCA found, the evidence was not only largely circumstantial, but substantially circumstantial. The evidence clearly showed more than just an affair. Petitioner may have been blinded by love and/or persuaded, enticed, and/or manipulated by Brenda to assist her in the murder of her husband, but that does not diminish Petitioner's criminal liability for his actions. Because the presented evidence supports the jury's determination and the OCCA's finding, Petitioner's Ground Three is

denied. If Petitioner's constitutional rights were otherwise infringed by the additional allegations made by Petitioner regarding the composition of his jury and certain evidentiary rulings, they have been addressed herein as presented and on their own individual merit as these arguments fall outside of the inquiry mandated by <u>Jackson</u>.

### D. Exclusion of Evidence That Someone Else Committed the Murder (Ground Four).

In Ground Four, Petitioner contends that his right to present a defense was infringed by the trial court's exclusion of evidence that someone else (other than Brenda) committed the murder.[30]  Petitioner raised this claim on direct appeal.  In denying relief, the OCCA

---

[30] Petitioner also claims that his Eighth Amendment right was infringed by the exclusion of this evidence.  Although Petitioner did not raise this aspect of his claim on direct appeal, the Court finds that this unexhausted aspect of his claim is without merit.  <u>See</u> 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").  Relying on <u>Green v. Georgia</u>, 442 U.S. 95 (1979), and <u>Lockett v. Ohio</u>, 438 U.S. 586 (1978), Petitioner asserts that "[t]he inability to present evidence of other perpetrators in a capital case is particularly egregious." Petition, p. 88.  Relative to the second stage, Petitioner's contention is that Zjaiton Wood's confession could have lessened his culpability.

> [T]he petitioner's argument is that the excluded evidence may have permitted [the] jury to conclude Mr. Pavatt was involved in Rob Andrew's murder, but that he did not directly participate, and that Zjaiton Wood and Brenda Andrew were directly responsible.  If the jury viewed the evidence in this way it would not prevent the jury from finding Mr. Pavatt guilty of first degree murder, but it might well have prevented them from giving him the death penalty.

Reply, p. 42.

Couching his claim in the Eighth Amendment does not strengthen his argument.  The issue remains whether Oklahoma's limitations on the admission of this evidence constituted an arbitrary denial of Petitioner's right to present a defense.  Although the Supreme Court in <u>Green</u> found that third-party guilt evidence (an admission by Green's co-defendant that Green was not even present when the co-defendant shot and killed the victim they had abducted together) should have been

(continued...)

found that the trial court did not abuse its discretion in excluding the evidence pursuant to

Okla. Stat. tit. 12, § 2804(B)(3), and that application of this evidentiary rule in Petitioner's

case did not run afoul of the Supreme Court's decision in <u>Holmes v. South Carolina</u>,

547 U.S. 319 (2006). Not surprisingly, Petitioner and Respondent disagree as to whether the

OCCA's decision is contrary to or an unreasonable application of <u>Holmes</u>.

     <u>Holmes</u> was decided while Petitioner's direct appeal was pending. In <u>Holmes</u>, the

defendant was charged with beating, raping, and robbing an elderly woman in her home, and

the State's evidence against him was predominately forensic. <u>Holmes</u>, 547 U.S. at 321-22.

As in Petitioner's case, the issue in <u>Holmes</u> was the exclusion of third-party guilt evidence.

In affirming the trial court's ruling excluding evidence which the defendant sought to

introduce, the South Carolina Supreme Court articulated the evidentiary standard as follows:

"'where there is strong evidence of an appellant's guilt, especially where there is strong

forensic evidence, the proffered evidence about a third party's alleged guilt does not raise a

reasonable inference as to the appellant's own innocence.'" Accordingly, it found that the

trial court did not err in excluding the third-party guilt evidence because the defendant "could

not 'overcome the forensic evidence against him to raise a reasonable inference of his own

---

[30](...continued)
admitted in the second stage of a capital proceeding, it additionally found that the omitted testimony
was "highly relevant to a critical issue in the punishment phase of the trial . . . . and substantial
reasons existed to assume its reliability." <u>Green</u>, 442 U.S. at 97. Regarding the reliability of the
statement, the Court noted that not only was the statement against penal interest spontaneously made
to a close friend, but it was supported by "ample" corroborating evidence. <u>Id.</u> As discussed herein,
because Mr. Wood's confession lack reliability, the CCA did not unreasonably conclude, in light
of <u>Holmes v. South Carolina</u>, 547 U.S. 319 (2006), that there was no constitutional error in its
exclusion.

innocence.'" Holmes, 547 U.S. at 324 (quoting State v. Holmes, 605 S.E.2d 19, 24 (S.C. 2004)).

In Holmes, the Supreme Court discussed the constitutional balance between the wide latitude given to States in constructing evidentiary rules in criminal trials and a defendant's meaningful opportunity to present a complete defense. The Supreme Court stated the precedential standard as follows: a defendant's "right [to present a complete defense] is abridged by evidence rules that infring[e] upon a weighty interest of the accused and are arbitrary or disproportionate to the purposes they are designed to serve." Holmes, 547 U.S. at 324-25 (quoting United States v. Scheffer, 523 U.S. 303, 308 (1998)) (internal quotation marks omitted). The Court then discussed the cases in which it had previously found certain state evidentiary rules to be arbitrary and thus unconstitutional. Id. at 325-26 (discussing Washington v. Texas, 388 U.S. 14 (1967); Chambers v. Mississippi, 410 U.S. 284 (1973); Crane v. Kentucky, 476 U.S. 683 (1986); and Rock v. Arkansas, 483 U.S. 44 (1987)). Nevertheless, the Court maintained that

> [w]hile the Constitution thus prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury.

Id. at 326.

One such well-established rule governs the admission of evidence that someone else committed the crime for which the defendant is charged. Widely-accepted evidentiary rules

exclude this type of evidence without running afoul of a defendant's constitutional right to present a defense when the tendered evidence is remote, speculative, lacking a connection to the crime, and/or does not tend to prove (or disprove) a material fact at issue. Id. at 327 & n.* (quoting Corpus Juris Secundum and American Jurisprudence and listing multiple jurisdictions which employ some variation of the rule).  Until 2001, South Carolina applied an acceptable variation of this constitutionally permissible rule. The rule required more than a "'bare suspicion'" or "'conjectural inference'" that someone else committed the crime. Admission was permitted only when there is "'proof of connection with it, such a train of facts or circumstances, as tends clearly to point out such other person as the guilty party.'" Id. at 328 (quoting State v. Gregory, 16 S.E.2d 532, 534-35 (S.C. 1941)).

In State v. Gay, 541 S.E.2d 541 (S.C. 2001), however, and in Holmes as well, the South Carolina Supreme Court applied a "radically" altered standard which shifted the focus from an evaluation of the relevance and reliability of the proffered evidence to an assessment of the State's evidence of guilt.  Holmes, 547 U.S. at 328-29.

> Under this rule, the trial judge does not focus on the probative value or the potential adverse effects of admitting the defense evidence of third-party guilt. Instead, the critical inquiry concerns the strength of the prosecution's case: If the prosecution's case is strong enough, the evidence of third-party guilt is excluded even if that evidence, if viewed independently, would have great probative value and even if it would not pose an undue risk of harassment, prejudice, or confusion of the issues.

Id. at 329.  Although the defendant in Holmes had challenged the reliability of the State's forensic evidence (i.e., fabrication, contamination, handling, and collecting), the court did not even consider these challenges before labeling the State's evidence as "strong."

Interpreted in this way, the rule applied by the State Supreme Court does not rationally serve the end that the <u>Gregory</u> rule and its analogues in other jurisdictions were designed to promote, *i.e.*, to focus the trial on the central issues by excluding evidence that has only a very weak logical connection to the central issues. The rule applied in this case appears to be based on the following logic: Where (1) it is clear that only one person was involved in the commission of a particular crime and (2) there is strong evidence that the defendant was the perpetrator, it follows that evidence of third-party guilt must be weak. But this logic depends on an accurate evaluation of the prosecution's proof, and the true strength of the prosecution's proof cannot be assessed without considering challenges to the reliability of the prosecution's evidence. Just because the prosecution's evidence, *if credited*, would provide strong support for a guilty verdict, it does not follow that evidence of third-party guilt has only a weak logical connection to the central issues in the case.

<u>Id.</u> at 330. "The point is that, by evaluating the strength of only one party's evidence, no logical conclusion can be reached regarding the strength of contrary evidence offered by the other side to rebut or cast doubt." Thus, the Supreme Court found application of this evidentiary rule to be arbitrary and unconstitutional. <u>Id.</u> at 331.

The evidence which was excluded in Petitioner's case is a confession by Zjaiton Wood. Mr. Wood was in the county jail, along with Petitioner and Brenda, awaiting his own capital murder trial when he allegedly wrote letters to the trial court and to defense counsel in which he admitted to killing Rob. In virtually identical letters, Mr. Wood describes how Rob was a random victim. Mr. Wood states that he followed Rob to the Shaftsbury residence, and before exiting his own vehicle, he loaded his 16-gauge shotgun and put a ski mask and extra ammunition in his pocket. Mr. Wood continues as follows:

As I was on my way to the intended target I noticed that the garage door was coming open, that's when I saw a woman standing inside of it. I waited for a while to make sure everything was clear and I noticed that the intended target

was on his way down like he was bending. I took my ski mask and put it on and put the pistol I had in my pocket. I made my way slowly in the back of the house so I wouldn't be spotted. As I approached the house where the target was I came to the side of the house I noticed the target (Robert Andrews) bent down working on a heater or air condition unit. At that time I came from the spot I was and fired my first shot without any word my target fell at once to the garage floor and befor I fired my second shot I remembered the woman (Ms. Andrews) standing there like she was in shock. I fired one more round into my victim and noticed that the female was about to run. I dropped my discarded shotgun and grabbed the woman. I pulled the pistol out of my pocket and fired one shot at her hitting her in an unknown spot in the upper body and pushed her to the ground. Once the lady was on the ground I proceeded to pat my dead victims pocket's for his bill fold but couldn't find nothing so I fled to a hidding post until I seen that every thing was clear. I climbed through a window next door and hid in the attic. As I fled an returned to my dwelling I realized I had missed one of my shell's to my shotgun at the victims house. I also noticed that I left some of my shotgun and pistol shell's in the attic I was hidding in.

(Court's Exhibit 3) (errors in original).

On September 9th, defense counsel filed a motion to endorse Mr. Wood, as well as three detention officers, and the letter he received from Mr. Wood, as well as any jail reports regarding the letter, if any existed (O.R. X, 1941-43). Two in camera hearings were held on the motion. The primary issue at the first hearing, held on Friday, September 12th, was whether Mr. Wood could be compelled to testify. Mr. Wood's attorney was present at the hearing, and she not only strenuously objected to him testifying, but she did not even want him brought to the courtroom. Based on her knowledge of the case from media reports, Mr. Wood's attorney argued that the letters appeared inconsistent with the evidence and she asked that Petitioner's counsel first be required to put forth evidence demonstrating the letters' credibility and trustworthiness (M. Tr. 9/12/03, 8-18). The prosecutor agreed with

Mr. Wood's attorney that admission of Mr. Wood's confession required a showing of reliability and she also argued that his confession was inconsistent with the physical evidence (M. Tr. 9/12/03, 18-21). In response, defense counsel argued that the indicia of reliability was shown because Mr. Wood wrote the letter and signed it (at least defense counsel's copy was signed). Defense counsel also argued that the inconsistencies between the confession and Brenda's version of events was of no consequence because no one believed her story (M. Tr. 9/12/03, 21-23). The trial court ruled that Mr. Wood would not be required to testify and that the letter would not be admitted due to absence of evidence showing its reliability. Defense counsel was permitted to re-urge the issue with respect to the endorsement of the three detention officers (M. Tr. 9/12/03, 23-31).

After a weekend recess, a second in camera hearing was held on Monday, September 15th. At this hearing, defense counsel, noting that Mr. Wood had been deemed an unavailable witness, argued that the three detention officers should be allowed to testify regarding their belief that Mr. Wood wrote the letters and as to oral statements against penal interest Mr. Wood made to them (M. Tr. 9/15/03, 4-7). In response, the prosecutor referenced the requirements of Title 12, § 2804(B)(3), which provides in pertinent part that "[a] statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement." The prosecutor argued, as she had previously, that Mr. Wood's confession had not been shown to be reliable (M. Tr. 9/15/03, 7-10). Defense counsel unsuccessfully argued that corroboration existed because Mr. Wood had repeatedly

confessed. Next, he re-asserted (as he did at the prior hearing) that the confession should not be excluded because it was inconsistent with Brenda's version of events. Finally, he claimed that the reliability could be shown by the officers testifying as to their familiarity with Mr. Wood's handwriting (M. Tr. 9/15/03, 10-12). After the trial court overruled the motion, defense counsel made an offer of proof that (1) had Mr. Wood been allowed to testify, he would have admitted that he killed Rob and he "would have provided additional details as set out in his letter," and (2) had the detention officers been allowed to testify, they would have testified as to oral statements made by Mr. Wood which were consistent with statements made in his confession; that the confession letters appeared to be in Mr. Wood's handwriting; that Mr. Wood gave the letters to one of them for mailing; and that Mr. Wood had told at least one of the detention officers that he was acquainted with Brenda prior to their incarceration in the Oklahoma County Jail. Defense counsel argued "that this evidence taken together would have provided a reasonable alternative theory of how this crime was committed, that the appropriate nexus was in fact Mr. Wood's statements" (M. Tr. 9/15/03, 12, 15-17).

In denying Petitioner relief on this claim, the OCCA acknowledged the applicability of § 2804(B)(3) and the evidentiary support a defendant must offer to justify admission of a statement which inculpates the maker and exculpates the defendant.

> There is no question that the letters in question contained statements against the author's penal interest. The putative author of the letters (Wood) was unavailable because he could not be compelled to testify. Even assuming that [Petitioner] could establish authorship of the letters, he was still required to establish (1) that a reasonable person in the author's position would not have

made the statements if they were not true, and (2) corroborating circumstances which "clearly" indicate the trustworthiness of the letters. The trial court is not limited to gauging the credibility of an exculpatory statement by reference to the evidence supporting the State's theory. The court may, and indeed should, consider any relevant evidence—even evidence the State discounts—in determining whether the statement is trustworthy enough to be admissible.

Pavatt, 159 P.3d at 287 (citations omitted). The OCCA then noted the facts before the trial court which weighed into its determination that the letters were not trustworthy.

As noted, Zjaiton Wood was himself awaiting trial on an unrelated charge of first-degree capital murder. He just happened to be housed in the same "pod" of the county jail as [Petitioner]. The letters were handwritten but practically identical; that is, it appeared that one had been copied verbatim from the other, or that they had both been copied from another source. While the letters were detailed, they were perhaps *too* detailed, appearing to parrot certain key features of the State's case. The letters were mailed shortly after [Petitioner's] trial began—after the State had publicly outlined the salient features of its case. The trial court was also presented with information that Brenda Andrew had allegedly threatened a female witness who was to testify at one of the criminal proceedings against Wood, and that Wood had allegedly attempted to "confess" to other local murders besides this one. The trial court was entitled to consider all of this information in deciding whether the letters were presumptively credible enough to be admitted under § 2804.

In addition, the contents of the letters were inconsistent with other evidence, including some facts beyond the State's theory of the case. For example, while the letters claimed that the 16–gauge shotgun used to kill Andrew was left at the scene, no such weapon (or any weapon for that matter) was found in the vicinity. In fact, the 16–gauge shotgun used to kill Rob Andrew—which was the same unusual gauge of shotgun that Rob Andrew owned and had left in the home when he moved out—was never found. The letters claim that Wood acted alone in the murder, and this is inconsistent with both Brenda Andrew's own claim that *two* assailants attacked her husband, and the letter, written by [Petitioner], claiming that he enlisted another man to help him kill Rob Andrew. While the State obviously did not believe either account,

the discrepancies between the letters purportedly written by Wood, and the defendants' respective versions of events, was something the trial court was entitled to consider in gauging the reliability of the letters.

Id. at 287-88 (citations omitted) (footnote omitted).

The OCCA even expressly discussed Holmes, finding that § 2804(B)(3) "is nothing like the rule invalidated in Holmes." Id. at 288-89.

[Section 2804(B)(3)] permits the reliability of the hearsay statement to be judged by any relevant evidence, presented to the court on the preliminary question of admissibility. . . .The letters purportedly written by Wood were not inadmissible merely because they were inconsistent with the State's theory; they were inadmissible because there simply was nothing offered to corroborate them.

A confession tends to be more trustworthy if it provides hitherto-unknown facts which are not only verifiable, but also consistent with known facts. The letters at issue fail both parts of this test. As explained in our discussion of Proposition 5, a substantial amount of evidence, both direct and circumstantial, from a variety of witnesses and other sources, coalesced into a web of proof strongly implicating [Petitioner] in a murderous conspiracy to kill Rob Andrew. We fail to see how a jury could possibly have discounted all of this evidence in favor of a theory that Zjaiton Wood—with no known connection to anyone in this case—happened to drive up and murder Rob Andrew for his wallet, in his garage, using the same unusual gauge of shotgun that used to be in the Andrews' home but which is now nowhere to be found. Under these circumstances, the trial court did not abuse its discretion in either refusing to compel Wood to affirm or deny authorship of the letters, or in excluding the letters from the trial, pursuant to 12 O.S. § 2804(B)(3), as uncorroborated and unreliable. This proposition is denied.

Id. at 289 (footnote omitted).

Petitioner asserts that the OCCA's decision is in conflict with Holmes for two reasons.

First, Petitioner contends that the OCCA's decision is based on an unreasonable determination of the facts. Here, Petitioner faults the trial court for not receiving any

testimonial evidence at the hearings held on the matter, and he argues that the trial court's reliability determination was based more on assumption than evidence.[31] Because the OCCA relied on the findings made by the trial court, Petitioner contends that the OCCA's decision is an unreasonable determination of the facts. Petitioner's arguments, however, ignore the fact that it was his responsibility to present corroborating evidence. As the OCCA noted in its opinion, "*[e]ven assuming that [Petitioner] could establish authorship of the letters*, he was still required to establish . . . corroborating circumstances which 'clearly' indicate the trustworthiness of the letters." Id. at 287 (emphasis added). At the hearings, Petitioner sought to present Mr. Wood and three detention officers to establish that Mr. Wood wrote the letters and that Mr. Wood made other verbal statements against his penal interest. Establishing that Mr. Wood was the author of letters and the maker of statements that he killed Rob falls short of meeting the evidentiary burden for admission of the evidence. Petitioner has continually argued that the confession speaks for itself, i.e., because it was made, and made repeatedly, it is reliable and trustworthy. It is clear that Oklahoma law, and particularly § 2804(B)(3), require more, and, as more fully discussed below, Petitioner has

---

[31] Petitioner takes issue with the following information which was made known during the hearing: (1) that Petitioner was housed in the same pod with Mr. Wood; (2) that Mr. Wood had confessed to other murders; and (3) that Brenda intimidated a witness in Mr. Wood's trial. Petitioner also faults the trial judge for using her experience and common sense to support her belief that Mr. Wood did not write the letter or if he did, that the words were not his own. Despite Petitioner's challenge to these findings, the fact remains, as discussed herein, that Petitioner nevertheless failed to come forth with evidence demonstrating the trustworthiness of Mr. Wood's confession.

not shown that this evidentiary hurdle is an arbitrary intrusion on his right to present a defense.

Petitioner's second argument is that the OCCA's decision is contrary to or an unreasonable application of <u>Holmes</u>. Here, Petitioner asserts that Oklahoma's § 2804(B)(3) "is almost identical" to the evidentiary standard found unconstitutional in <u>Holmes</u>. In support, Petitioner references the OCCA's concluding paragraph, set forth above, and argues that the OCCA excluded Mr. Wood's confession because "it did not fit with the State's case." Reply, pp. 39-40. As fully discussed above, the Supreme Court in <u>Holmes</u> acknowledged the well-established restrictions placed upon the admission of third-party perpetrator evidence in numerous jurisdictions. Such evidentiary rules are constitutional when applied "to focus the trial on the central issues by excluding evidence that has only a very weak logical connection to the central issues." <u>Holmes</u>, 547 U.S. at 330. In <u>Holmes</u>, however, South Carolina ran afoul of constitutionally permissible restrictions when it failed to assess the reliability of the offered evidence but looked *only* to the strength of the State's evidence in determining whether the defendant's evidence could come in. <u>Id</u>. at 331. The Supreme Court found that restricting the admission of third-party perpetrator evidence in this manner "is 'arbitrary' in the sense that it does not rationally serve the end that . . . third-party guilt rules were designed to further." <u>Id.</u>

Contrary to Petitioner's contention, the rule applied by Oklahoma to exclude Mr. Wood's confession is not identical to the one applied by South Carolina in <u>Holmes</u>. What the Supreme Court found to be arbitrary in <u>Holmes</u> is a rule which excludes a

50

defendant's evidence without assessing its own evidentiary merit. Holmes, 547 U.S. at 329 ("If the prosecution's case is strong enough, the evidence of third-party guilt is excluded even if that evidence, if viewed independently, would have great probative value and even if it would not pose an undue risk of harassment, prejudice, or confusion of the issues."). In Petitioner's case, the OCCA referenced the presented evidence, but Mr. Wood's confession was not excluded solely because it failed to sync with the State's evidence. As the OCCA noted, "[a] confession tends to be more trustworthy if it provides hitherto-unknown facts which are not only verifiable, but also consistent with known facts." Pavatt, 159 P.3d at 289. Even if one were to assume that Petitioner and/or Brenda had no influential contact with Mr. Wood in the drafting of his confession, Mr. Wood's letters provide no "hitherto-unknown facts." In fact, Mr. Wood's confession could have easily been compiled from the media reports. Moreover, the confession actually contradicts the known facts. As examples, (1) Mr. Wood states that the 16-gauge shotgun he used to kill Rob was "discarded" after he shot Rob a second time but before he shot Brenda; however, the murder weapon was never recovered (J. Tr. XI, 2751); (2) Mr. Wood states that he patted down Rob's pockets for a billfold but could not find anything; however, Rob's wallet was in his front pants pocket and it contained $60 in cash and several credit cards (J. Tr. IX, 2258-59, 2307-08; State's Exhibits 46 and 69); and (3) Mr. Wood states that he entered the Gigstad residence through a window and hid in the attic; however, Mr. Gigstad's testimony was that the house was secure when he left it (J. Tr. X, 2589-90). Finally, it is simply beyond rational comprehension that Brenda just got lucky and in the midst of her overwhelming desire to see her husband

killed (and enlisting Petitioner's to help her do so), Mr. Wood, a complete stranger, randomly selected Rob as his victim at the very moment he was coming to a residence where he had ceased living some two months before to pick up his kids for a long holiday weekend that Brenda did not want to happen. See Pavatt, 159 P.3d at 289 ("We fail to see how a jury could possibly have discounted all of this evidence in favor of a theory that Zjaiton Wood—with no known connection to anyone in this case—happened to drive up and murder Rob Andrew for his wallet, in his garage, using the same unusual gauge of shotgun that used to be in the Andrews' home but which is not nowhere to be found."). Clearly, Mr. Wood's confession lacked reliability and trustworthiness, and the OCCA did not unreasonably apply Holmes in so finding.

For the foregoing reasons, Petitioner has failed to show that the OCCA's decision upholding the trial court's exclusion of the evidence pursuant to § 2804(B)(3) is contrary to or an unreasonable application of Supreme Court law or an unreasonable determination of the facts. Relief on Petitioner's Ground Four is therefore denied.

**E.      Ineffective Assistance of Appellate Counsel: Handwriting Expert (Ground Five).**

In Ground Five, Petitioner asserts that his appellate counsel was ineffective for failing to raise claims on direct appeal regarding the State's handwriting expert. Petitioner asserts that appellate counsel should have challenged the trial court's denial of his request for a

Daubert/Kumho[32] hearing on the admissibility of handwriting analysis. Petitioner additionally asserts that appellate counsel should have argued that the expert's testimony was in any event improper because it included his ultimate opinion that Petitioner wrote the confession letter (State's Exhibit 222).[33] Petitioner presented this ground for relief to the OCCA in his first post-conviction application and the OCCA denied relief on the merits. Respondent asserts that Petitioner has failed to show that the OCCA's decision is contrary to or an unreasonable application of Supreme Court law.

As previously noted in the analysis of Petitioner's Ground Two, supra, claims regarding the effectiveness of appellate counsel are governed by Strickland. Thus, to obtain relief, a petitioner must show that appellate counsel's actions were objectively unreasonable and that but for counsel's unreasonable actions, his appeal would have been successful. Here again, the OCCA elected to dispose of Petitioner's claim on the prejudice prong. The OCCA found that even if appellate counsel had raised the claim on direct appeal, he would not have prevailed on appeal. Pavatt, No. PCD-2004-25, slip op. at 7 n.8.

---

[32] Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993); Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137 (1999). Oklahoma applies the standards set forth in Daubert and Kumho to determine the admissibility of novel expert testimony. Harris v. State, 84 P.3d 731, 745 (Okla. Crim. App. 2004).

[33] Petitioner notes that the handwriting expert also testified that Rob did not sign the form submitted to Prudential to change the ownership of his $800,000 life insurance policy (State's Exhibit 24); however, in his argument to the OCCA on post-conviction and in the argument to this Court, Petitioner does not challenge this testimony, but focuses solely on the expert's testimony regarding the confession letter.

Petitioner has not demonstrated that the OCCA's decision on this claim is contrary to or an unreasonable application of <u>Strickland</u>. The OCCA found that the claim lacked merit because Petitioner failed to cite controlling authority which required the trial court to hold a <u>Daubert/Kumho</u> hearing before permitting the testimony of the State's handwriting expert. Petitioner's argument to the OCCA on post-conviction was that his appellate counsel should have raised the issue because "[t]he issue of handwriting uniqueness has been questioned in other courts in this country." Petitioner then cited federal district court cases which either excluded the evidence or prevented the expert from giving his ultimate opinion. Original Application for Post-Conviction Relief, No. PCD-2004-25, pp. 67-68. Given the absence of controlling Oklahoma law, it was reasonable for the OCCA to find that had appellate counsel raised the issue, Petitioner would not have prevailed on appeal.

As to the expert's opinion that Petitioner wrote the confession letter, Petitioner relies on the OCCA's decision in <u>McCarty v. State</u>, 765 P.2d 1215 (Okla. Crim. App. 1988), to assert that the expert's opinion in his case went beyond what is deemed permissible. <u>See</u> Okla. Stat. tit. 12, § 2704 (permitting an expert to give his opinion even if "it embraces an ultimate issue to be decided by the trier of fact"). In <u>McCarty</u>, the OCCA faulted an expert who, while acknowledging during her testimony "that forensic science techniques had not advanced to the point where a person could be positively identified through blood types, secretor status, or hair examination," thereafter testified that the defendant was in fact physically present when the victim was assaulted. The OCCA found the expert's testimony regarding the defendant's presence at the crime scene was improper "because it was beyond

the present state of the art of forensic science, and certainly beyond [the expert's] personal knowledge." McCarty, 765 P.2d at 1218, 1219.

Unlike the expert in McCarty, the handwriting expert in Petitioner's case did not testify beyond his expertise. The handwriting expert (a/k/a "question document examiner"), David Parrett, testified extensively about his training and experience, about the principles of handwriting identification, and about how handwriting examinations and comparisons are conducted (J. Tr. XII, 3222-32), and he detailed for the jury his examination and comparison of Petitioner's known writing samples to the confession letter (J. Tr. XII, 3244-65; State's Exhibits 224-26). From noted characteristics in the writings, Mr. Parrett expressed his opinion as follows:

> After comparing the known samples of handwriting of Mr. Pavatt, looking at the individual characteristics in his handwriting and the known samples that I had and the class characteristics in looking at the individual characteristics and the class characteristics in the question letter I noted like characteristics and found no significant differences. It was therefore my opinion that the person who prepared the known standards that I looked at, Mr. Pavatt did indeed prepare the letter which was the questioned item, State's Exhibit 222.

(J. Tr. XII, 3244). Having compared the expert testimony in the present case to the testimony found improper in McCarty, the Court cannot find that the OCCA unreasonably denied relief to Petitioner based on appellate counsel's failure to raise the issue.

In conclusion, the Court finds that Petitioner has not shown that the OCCA unreasonably applied Strickland to the determination of this allegation of error against his appellate counsel. Ground Five is therefore denied.

### F.    Ineffective Assistance of Appellate Counsel: Accessory After the Fact Instruction (Ground Six).

In Ground Six, Petitioner claims once again that his appellate counsel was ineffective. Petitioner's argument here is that his appellate counsel should have raised a claim on direct appeal asserting a violation of his Eighth Amendment rights due to the trial court's failure to instruct the jury on accessory after the fact as a lessor included offense. Petitioner raised this claim to the OCCA in his first post-conviction application. Denying the claim on the merits, the OCCA found that Petitioner had failed to demonstrate prejudice as required by Strickland. See Ground Two, supra (discussing the application of Strickland to claims of ineffective assistance of appellate counsel). Respondent asserts that the OCCA's decision is entitled to AEDPA deference and that Petitioner has failed to show that the OCCA's decision is contrary to or an unreasonable application of Supreme Court law.

The Eighth Amendment claim that Petitioner faults his appellate counsel for not raising is founded on Beck v. Alabama, 447 U.S. 625 (1980). In Beck, the Supreme Court addressed the constitutional ramifications of lesser-included instructions for a capital crime. Prior to Beck, the Supreme Court had "never held that a defendant is entitled to a lesser included offense instruction as a matter of due process." Beck, 447 U.S. at 637. In Beck, however, the Supreme Court carved out an exception for those high stake cases where the death penalty is a possible punishment.

> For when the evidence unquestionably establishes that the defendant is guilty of a serious, violent offense–but leaves some doubt with respect to an element that would justify conviction of a capital offense–the failure to give the jury

the "third option" of convicting on a lesser included offense would seem inevitably to enhance the risk of an unwarranted conviction.

Such a risk cannot be tolerated in a case in which the defendant's life is at stake. As we have often stated, there is a significant constitutional difference between the death penalty and lesser punishments. . . .

Id. Beck, therefore, requires a trial court in a capital case to give the jury a third option to convict the defendant for a lesser-included non-capital offense, when such lesser offense is supported by the evidence. Id. at 627.

The problem with Petitioner's reliance on Beck, however, is that in Oklahoma the crime of accessory after the fact is not a lesser included offense of first degree murder. Cummings v. State, 968 P.2d 821, 834 (Okla. Crim. App. 1998); VanWoundenberg v. State, 720 P.2d 328, 335 (Okla. Crim. App. 1986). As Respondent points out as well, the Supreme Court in the later case of Hopkins v. Reeves, 524 U.S. 88, 96-97 (1998), emphasized that Beck applies only to lesser included offenses, not lesser related offenses. Therefore, had appellate counsel challenged the trial court's failure to instruct the jury on the crime of accessory after the fact under Beck, it is clear that Petitioner would not have prevailed on this claim. Accordingly, Petitioner has failed to demonstrate that the OCCA's denial of his claim on Beck grounds is unreasonable.

In his Reply, Petitioner argues that because Oklahoma law requires instructions on both lesser included offenses and lesser related offenses, his Eighth Amendment claim under Beck and Hopkins is nevertheless viable. See Glossip v. State, 29 P.3d 597, 603-04 (Okla. Crim. App. 2001). In light of the clear pronouncements in Beck and Hopkins, the Court does

not agree. However, that does not preclude Petitioner from arguing that his state law rights have been infringed by the trial court's refusal to instruct on the crime of accessory after the fact as a lesser related offense. See Arizona v. Evans, 514 U.S. 1, 8 (1995) ("[S]tate courts are absolutely free to interpret state constitutional provisions to accord greater protection to individual rights than do similar provisions of the United States Constitution."). But even if Petitioner's claim is evaluated from a state law perspective, the Court still cannot conclude that the OCCA acted unreasonably in finding that the claim would have been unsuccessful on appeal. As referenced in the Committee Comments to Oklahoma's uniform instructions on accessory after the fact, "[a]n individual becomes an accessory under Oklahoma statutory provisions only when that individual becomes associated with the offender and his fate subsequent to the commission of the original offense. One who participates either prior to or during the commission of the offense is liable as a principal." OUJI-CR (2d) 2-4 (citing Wilson v. State, 552 P.2d 1404 (Okla. Crim. App.1976), and Vann v. State, 207 P. 102 (Okla. Crim. App. 1922)). In the present case, there was a wealth of evidence showing that Petitioner was involved in the murder prior to its commission. In light of this evidence, the OCCA could reasonably find the absence of prejudice under Strickland resulting from appellate counsel's failure to raise this issue on direct appeal.

For the foregoing reasons, the Court finds that Petitioner's Ground Six is without merit. It is hereby denied.

### G.    Prosecutorial Misconduct (Ground Seven).

In Ground Seven, Petitioner details eight claims of prosecutorial misconduct. Some of these claims were presented to the OCCA in Petitioner's direct appeal and some were raised on post-conviction. One has never been presented to the OCCA. Due to the varying presentation of these claims to the OCCA, some are subject to AEDPA review on the merits and others are procedurally barred.

### 1.    Claims Raised on Direct Appeal.

Petitioner raised four of his eight claims on direct appeal. Because these claims were denied on the merits by the OCCA, they are reviewed here under the AEDPA standard. Petitioner will therefore only be entitled to relief upon a showing that the OCCA's decision is contrary to or an unreasonable application of Supreme Court law.

Allegations of prosecutorial misconduct are given due process review. Stouffer v. Trammell, 738 F.3d 1205, 1221 (10th Cir. 2013). The question is whether the prosecutor's actions or remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974). A fundamental fairness inquiry "requires examination of the entire proceedings, including the strength of the evidence against the petitioner, both as to guilt at that stage of the trial and as to moral culpability at the sentencing phase." Le v. Mullin, 311 F.3d 1002, 1013 (10th Cir. 2002). "The ultimate question is whether the jury was able to fairly judge the evidence in light of the prosecutors' conduct." Bland, 459 F.3d at 1024.

Petitioner's third claim of prosecutorial misconduct concerns the testimony of Kurt Stoner, an FBI agent and State's witness. Petitioner faults the prosecutor for eliciting improper opinion testimony from Agent Stoner.[34] At the end of direct examination, the prosecutor asked Agent Stoner if he had formed an opinion about Petitioner's involvement in Rob's murder. Before defense counsel could object, Agent Stoner replied, "That he's directly involved" (J. Tr. XII, 3059-60). After a lengthy discussion at the bench, the trial court admonished the jury to disregard Agent Stoner's answer. The jury was also admonished the jury to disregard opinion testimony given by Petitioner's daughter, Janna, regarding her opinion that Petitioner was not involved (J. Tr. XI, 2942; J. Tr. XII, 2997, 3031, 3060-65).

The OCCA detailed the circumstances leading up to Agent Stoner's testimony and addressed Petitioner's claim as follows:

> In Proposition 3, [Petitioner] claims error when a State's witness was allowed to interject hearsay and give his personal opinion of [Petitioner's] guilt. Defense counsel timely objected to this testimony, so the issue was preserved for appellate review. We review the trial court's evidentiary rulings for an abuse of discretion.

---

[34] On direct appeal, Petitioner argued that Agent Stoner's opinion testimony was improper and that the admonishment was not sufficient to cure the error. Although Petitioner cast aspersions on the prosecutor ("After attempting to interject hearsay evidence, the prosecutor moved in for the kill. . . ."), Petitioner did not directly challenge the prosecutor's conduct in his claim for relief. Brief of Appellant, No. D-2003-1086, pp. 23-26. Nevertheless, Respondent has argued that the OCCA addressed the merits of the prosecutorial claim raised here, and she urges AEDPA review. Response, p. 103. In his Reply, Petitioner agrees with Respondent that the prosecutorial misconduct claim was raised on direct appeal, but he argues that the OCCA failed to address it. Consequently, Petitioner argues for de novo review of his claim. Reply, pp. 62-66. The Court finds it unnecessary to resolve this presentation issue because even under a de novo review, the Court finds itself in agreement with the OCCA's resolution of the issue.

Janna Larson, [Petitioner's] daughter, testified in the State's case in chief about her conversations with her father before and after Andrew's murder, and about her observations of her father's conduct. [Petitioner] made incriminating statements to Larson, told her of his affair with Brenda Andrew, and enlisted her help at various times in his efforts to perpetrate the murder and avoid detection. After [Petitioner] and Brenda left for Mexico, Larson contacted an attorney, and soon agreed to cooperate with the authorities. One officer that she worked closely with was Agent Kurt Stoner of the Federal Bureau of Investigation. Larson was understandably not happy about having to testify against her father at trial. She implied that she cooperated with authorities out of fear that she might be implicated in the murder if she did not. While not an entirely hostile witness for the State, Larson was led by defense counsel, in cross-examination, to opine several times that she did not believe her father was actually complicit in Rob Andrew's murder.

After Larson testified, the State called Agent Stoner to the stand. Stoner offered his version of Larson's cooperation in the investigation. Stoner described Larson as angry with her father and eager to cooperate with the authorities; he denied that Larson was ever threatened with prosecution if she did not cooperate. The prosecutor then attempted, several times, to impeach parts of Larson's testimony on this point by asking Stoner what Larson had told him about her father's involvement in the murders. Each time, defense counsel objected, and the trial court sustained the objection. We need not decide whether this would have been proper impeachment because the testimony was never adduced; [Petitioner's] hearsay claim is unfounded.

The prosecutor then asked Stoner if, based on his law enforcement experience and involvement in this case, he had an opinion about [Petitioner's] guilt. Defense counsel promptly objected, but before the court could rule on the objection, Stoner said he believed [Petitioner] was "directly involved" in the murder. The trial court denied defense counsel's request for a mistrial. The record shows that the parties had discussed with the court, *in limine*, the possibility of one party opening the door to such evidence, and the prosecutor pointed out that the defense had just elicited the very same type of opinion testimony from Larson. The trial court admonished the jury to disregard any opinions about [Petitioner's] guilt, whether from Larson or Stoner.

We have often held that an admonition to disregard inadmissible testimony is presumed to cure any possible error. But given the situation presented in this case, we also find that any possible error was invited by the defense. Just before Agent Stoner took the stand, defense counsel elicited

Larson's opinion as to her father's innocence several times. Stoner was used to impeach several aspects of Larson's testimony, not just her opinion of her father's guilt. We do not condone counsel for either party gratuitously soliciting witness opinions as to what result the jury should reach. However, we do not believe the opinions of either Larson or Stoner—each of whom had a potential bias—left a serious impression on the jurors, particularly after the trial court admonished them to disregard both. This proposition is denied.

Pavatt, 159 P.3d at 290-91 (citations omitted).

Petitioner argues, as he did on direct appeal, that the admonishment given to the jury was insufficient to overcome the prejudicial nature of the statement. Petitioner bolsters this argument by asserting that the prejudice was attenuated by the weak evidence presented against him. The Court is unpersuaded by Petitioner's arguments. Claims of prosecutorial misconduct are not viewed in a vacuum, but in the context of the trial as a whole. The OCCA denied Petitioner relief on this claim because it found that Agent Stoner's testimony was no different than that elicited by the defense in the questioning of Petitioner's daughter, and that in any event, the jury was instructed to disregard the improper testimony from both witnesses. This conclusion is reasonable. See Wilson v. Sirmons, 536 F.3d 1064, 1119 (10th Cir. 2008) ("Even if the prosecutor's comments were improper, however, the trial court's admonition to the jury cured any error."); Battenfield v. Gibson, 236 F.3d 1215, 1225 (10th Cir. 2001) ("In light of the general presumption that a jury follows a trial court's instructions, see Weeks v. Angelone, 528 U.S. 225, 120 S. Ct. 727, 733, 145 L.Ed.2d 727 (2000), we are persuaded that the trial court's admonition was sufficient to cure any error arising out of the prosecutor's comment."). In addition, the record reflects that while defense counsel objected to Agent Stoner's testimony, defense counsel stated that he did not believe that the prosecutor

had acted inappropriately in posing the question which elicited Agent Stoner's response (J. Tr. XII, 3064-65) ("Judge, if I can just make clear for the record, I was not in any way suggesting that the improper action was on the part of Mr. Gieger in asking the question."). Finally, while the evidence against Petitioner may have been largely circumstantial, it was not weak. See Ground Three, supra. Accordingly, the Court finds that Petitioner was not denied a fundamentally fair trial by Agent Stoner's testimony and that Petitioner has failed to show that the OCCA's likewise determination is contrary to or an unreasonable application of Supreme Court law.

In his sixth, seventh, and eighth claims, Petitioner complains about statements made by the prosecutor during the second stage. Petitioner claims that the prosecutor inappropriately stated her personal opinion that Petitioner should receive the death penalty (J. Tr. XV, 3670-71, 3757, 3791-92), made calculated arguments to inflame the jury (J. Tr. XV, 3790-91), and made a statement undermining the jury's consideration of mitigating evidence (J. Tr. XV, 3775).[35]

---

[35] In his eighth claim, Petitioner additionally asserts that the prosecutor misstated the test regarding the jury's consideration of mitigating evidence (J. Tr. XV, 3745, 3776). However, this argument was not substantively raised on direct appeal, but on post-conviction and with respect to a claim regarding the ineffectiveness of Petitioner's appellate counsel. Original Application for Post-Conviction Relief, No. PCD-2004-25, p. 40. While the parties dispute the treatment this Court should afford the OCCA's post-conviction ruling on the issue, the Court finds that even under a de novo standard of review, appellate counsel was not ineffective for failing to cite these additional references concerning the jury's consideration of mitigating evidence. It is evident that these additional comments did not deny Petitioner a fundamentally fair trial. Donnelly, 416 U.S. at 643.

In denying Petitioner relief on these claims, the OCCA held as follows:

First, [Petitioner] complains of various comments that he describes as the personal opinions of the prosecutor. [Petitioner] refers to the prosecutor's comments that this was a "proper case for the death penalty"; that "there are no extenuating circumstances which mitigate the murder of Rob Andrew"; that this particular murder was "heinous, atrocious, or cruel"; that the jurors were "the only ones who can see that justice is done"; and, finally, that a death sentence was "the justice [Petitioner] deserves."

Counsel enjoy significant latitude in arguing their respective positions, so long as the arguments are based on evidence the jury has received. Washington, 1999 OK CR 22 at ¶ 42, 989 P.2d at 974. A prosecutor's comments do not amount to improper "personal opinion" merely because she asks the jury to impose the death penalty. See Bernay v. State, 1999 OK CR 37, ¶ 65, 989 P.2d 998, 1014 ("A prosecutor may comment on the punishment to be given"). The prosecutor's arguments in this case as to why [Petitioner] "deserved" the death penalty were based on her assessments of the evidence presented in court, and were entirely proper. See Toles v. State, 1997 OK CR 45, ¶ 65, 947 P.2d 180, 193 ("The prosecutor did not give his personal opinion of the death penalty; he argued why the death penalty was appropriate in this case").

[Petitioner] also claims that the prosecutor improperly engaged in speculation and evoked sympathy for the victim in the following passage:

When Rob Andrew lay dying on that garage floor, James Pavatt and Brenda Andrew looking at the sight that you see in those pictures, what do you believe his last words were? What do you believe he was trying to say when he was laying there on the floor looking up at Brenda Andrew's face? He was probably trying to say I love you, Brenda, because that's the kind of man he was.

Considering the evidence presented from the crime scene, and about Rob Andrew's feelings for his wife, this was actually a fair comment on the evidence. The prosecutor never suggested that the inference was based on anything the jury had not heard. See Alverson v. State, 1999 OK CR 21, ¶ 45, 983 P.2d 498, 514 (prosecutor's reference to murder victim as an "innocent man, trying to make a living for his wife and two baby boys," was a proper comment on the evidence).

To the extent this comment may have evoked sympathy for the victim, we do not find it so outrageous as to have denied [Petitioner] a fair sentencing proceeding. As the State had alleged that the murder of Rob Andrew was especially heinous, atrocious, or cruel, it was entitled to present evidence that Rob Andrew suffered extreme mental cruelty in conjunction with his death. DeRosa, 2004 OK CR 19 at ¶ 96, 89 P.3d at 1156. The evidence reasonably led to the conclusion that the last images Rob Andrew saw were of his wife and her lover working together to end his life. The prosecutor was entitled to suggest reasonable inferences about what Rob Andrew's last thoughts might have been, in order to establish the "heinous, atrocious, or cruel" aggravator. See Alverson, 1999 OK CR 21 at ¶ 46, 983 P.2d at 514 (prosecutor's asking the jury to imagine the feeling of a metal baseball bat hitting one's head was a permissible comment on the pain the victim may have felt prior to death); Hooper, 1997 OK CR 64 at ¶ 53, 947 P.2d at 1110 (prosecutor's statement that the murder victim "was immersed in a child's worst nightmare of being chased by an evil monster trying to kill her," and request that the jurors imagine what she went through, were based on the evidence presented and on the State's theory of how the victim died). We find no plain error in these statements.

Pavatt, 159 P.3d at 291-92.

Although it is apparent that Petitioner is dissatisfied with the OCCA's decision, he has not shown that the OCCA unreasonably determined the facts or denied him relief in a manner which is contrary to or unreasonable application of Supreme Court law. "[A] criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial." United States v. Young, 470 U.S. 1, 11 (1985). Moreover, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded

disagreement." <u>Richter</u>, 131 S. Ct. at 786-87.  Because the OCCA's decision is well within the accepted range of reasonableness, Petitioner is not entitled to relief on his sixth, seventh, and eighth claims of prosecutorial misconduct.

## 2.    Claims Raised on Post-Conviction.

Petitioner's first, second, and fifth claims of prosecutorial misconduct were raised for the first time in Petitioner's second application for post-conviction relief.  The OCCA declined to review the merits of these claims because "all of them could have been raised in prior proceedings." <u>Pavatt</u>, No. PCD-2009-777, slip op. at 3-4 (footnote omitted) (citing Okla. Stat. tit. 22, § 1089(D)(8)).  For the reasons discussed in Ground Two, <u>supra</u>, the Court finds that these claims are barred from federal review.

## 3.    Unexhausted Claim.

Petitioner's fourth claim of prosecutorial misconduct is unexhausted.  Having twice pursued post-conviction relief, it is clear that if Petitioner were to return to state court with this claim, the OCCA would decline to entertain its merits.  Therefore, the Court finds that like his first, second, and fifth claims of prosecutorial misconduct, this claim is procedurally barred as well.  <u>Lott v. Trammell</u>, 705 F.3d 1167, 1179 (10th Cir. 2013) (<u>citing</u> <u>Anderson v. Sirmons</u>, 476 F.3d 1131, 1139-40 n.7 (10th Cir. 2007), and applying an anticipatory procedural bar to an unexhausted claim), <u>cert.</u> <u>denied</u>, ___ U.S. ___, 134 S. Ct. 176 (2013).

**4.      Conclusion.**

For the foregoing reasons, the Court finds that Petitioner is not entitled to relief on his Ground Seven.  Relief is therefore denied.

**H.      Jury Instructions on Life and Life Without Parole (Ground Eight).**

In Ground Eight, Petitioner asserts that the jury was not adequately instructed on the sentencing options of life and life without parole.  The sum of Petitioner's argument is that the "jury should have been instructed that life without parole means that the defendant will remain incarcerated for his natural life and that life means that the defendant will serve at a minimum 85% of a 45 year sentence - or 38.25 years."  Reply, p. 78.  Petitioner asserts that these instructions were required under Supreme Court precedent and the OCCA's decision in Anderson v. State, 130 P.3d 273 (Okla. Crim. App. 2006).  Respondent contends that Petitioner's Ground Eight is unexhausted.  Respondent argues that while a state law version of Petitioner's Ground Eight was raised in Petitioner's first post-conviction application, the substance of the federal claim he now presents was not.  Respondent urges the application of an anticipatory procedural bar, while alternatively asserting that the claim can be denied on the merits.  The Court finds that disposal of Petitioner's claim on the merits is the easier course.  See 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."); Snow v. Sirmons, 474 F.3d 693, 717 (10th Cir. 2007) ("We can avoid deciding procedural bar questions where claims can readily be dismissed on the merits.").

As noted above, it is Petitioner's contention that his jury should have been given more information on the sentencing options of life and life without parole. Petitioner notes that in the written instructions given to the jury, these options were defined only as imprisonment for life with the possibility of parole and imprisonment for life without the possibility of parole (O.R. XI, 2048, 2050, 2054, 2058). Petitioner asserts that more was needed due to "confusion and inaccurate information" developed during voir dire, Petition, p. 128, and the OCCA's decision in Anderson.

In support of his claim, Petitioner cites several Supreme Court decisions.[36] Asserting a due process violation, Petitioner cites Simmons v. South Carolina, 512 U.S. 154 (1994), as well as related cases, Shafer v. South Carolina, 532 U.S. 36 (2001), and Kelly v. South Carolina, 534 U.S. 246 (2002).[37] In Simmons, a plurality opinion, the Supreme Court held that "where the defendant's future dangerousness is at issue, and state law prohibits the defendant's release on parole, due process requires that the sentencing jury be informed that the defendant is parole ineligible." Simmons, 512 U.S. at 156. Because the jury in Simmons may have reasonably believed that Simmons could be paroled if given a life sentence, the

---

[36] The Court construes Petitioner's primary claim to be one of due process; however, the Court acknowledges Petitioner's general argument and authority regarding his entitlement under the Eighth Amendment to an accurate and reliable sentencing determination. Petition, p. 130. For the same reasons more fully set out herein, the Court finds that Petitioner's Eighth Amendment claim lacks merit as well.

[37] In Shafer, a majority of the Court, addressing a new South Carolina sentencing scheme, reaffirmed the Simmons holding. Shafer, 532 U.S. at 51. In Kelly, a majority of the Court once again acknowledged Simmons as controlling authority, applying it a second time to a South Carolina case. Kelly, 534 U.S. at 248.

Court found that an unacceptable "misunderstanding pervaded the jury's deliberations" – one which "had the effect of creating a false choice between sentencing petitioner to death and sentencing him to a limited period of incarceration." Id. at 161. The Court reasoned that

> if the State rests its case for imposing the death penalty at least in part on the premise that the defendant will be dangerous in the future, the fact that the alternative sentence to death is life without parole will necessarily undercut the State's argument regarding the threat the defendant poses to society. Because truthful information of parole ineligibility allows the defendant to "deny or explain" the showing of future dangerousness, due process plainly requires that he be allowed to bring it to the jury's attention by way of argument by defense counsel or an instruction from the court.

Id. at 168-69 (citation omitted).

Despite his reliance on Simmons, however, Petitioner acknowledges that the Tenth Circuit has found that Oklahoma's sentencing scheme, which includes two clearly delineated life imprisonment options, does not on its face run afoul of Simmons. Petition, p. 132 (citing Mayes v. Gibson, 210 F.3d 1284, 1294 (10th Cir. 2000)). In an effort to circumvent this authority, Petitioner argues that the Tenth Circuit should revisit the applicability of Simmons to Oklahoma's sentencing scheme given the OCCA's decision in Littlejohn v. State, 85 P.3d 287 (Okla. Crim. App. 2004). In Littlejohn, the OCCA, while acknowledging that its sentencing scheme is Simmons compliant, additionally acknowledged that Oklahoma juries are nevertheless often confused about the traditional life sentence and the life sentence without parole, and it offered the following guidance to trial courts as they responded to questions about life sentencing options:

> Therefore, in future cases where the jury during deliberations asks, in some form or fashion, whether an offender who is sentenced to life

imprisonment without the possibility of parole is parole eligible, the trial court should either [1] refer the jury back to the instructions, [2] tell the jury that the punishment options are self explanatory, or [3] advise the jury that the punishment options are to be understood in their plain and literal sense and that the defendant will not be eligible for parole if sentenced to life imprisonment without the possibility of parole. While arguably the latter response is nothing more than another way of referring the jury back to the instructions, it does force the jury to accept the plain meaning of the sentencing options and impose the sentence it deems appropriate under the law and facts of the case. We recognize trial courts are in the best position to decide which answer is best suited to the situation as the questions posed by juries come in a myriad of forms on this issue. However, we believe the latter explanation may alleviate some obvious concerns of jurors more effectively than simply telling the jury it has all the law and evidence necessary to reach a decision.

Littlejohn, 85 P.3d at 292-94 (citations omitted). Petitioner asserts that in light of Littlejohn, even the OCCA acknowledges that more information should be given.

Petitioner's reliance on the OCCA's decision in Littlejohn does not cause this Court to question the application of Simmons to his case. As the Tenth Circuit found in the adjudication of Littlejohn's Simmons claim on appeal, the OCCA's Littlejohn decision may relay an accurate picture of the average juror's understanding, but it does overcome the precedential application of Simmons, Shafer, and Kelly which dictates the denial of relief. Littlejohn v. Trammell, 704 F.3d 817, 831 (10th Cir. 2013). Simmons and its progeny protect against the "false choice." Its holding requires jury notification of a capital defendant's parole ineligibility when the State has alleged that he is a continuing threat. This notification prevents "a false choice between sentencing petitioner to death and sentencing him to a limited period of incarceration." Simmons, 512 U.S. at 161. See Ramdass v. Angelone, 530 U.S. 156, 166 (2000) (noting that "Simmons created a workable [and limited]

rule."). In Petitioner's case, the jury was not faced with this false choice, but was given three sentencing options: life, life without parole, and death. This in and of itself is <u>Simmons</u> compliant.

In addition, this is not a situation where a false choice was created by the trial court. As acknowledged in <u>Littlejohn</u>, 704 F.3d at 827-28, the Tenth Circuit has found that even though Oklahoma's self-explanatory sentencing options are <u>Simmons</u> compliant, a due process violation may nevertheless be found where the trial court's responses to sentencing questions by the jury "engender jury confusion" and create the false choice. In Petitioner's case, there were no questions from the jury regarding the sentencing options, and thus no improper trial court responses. In addition, while Petitioner paints voir dire as a "backdrop of confusion and inaccurate information," Petition, p. 128, the Court finds nothing in the referenced passages which would lend support to a finding that the trial court created a false choice.

Petitioner's claim of <u>Anderson</u> error lacks merit as well. In his first post-conviction application, Petitioner did present this state law claim. In denying relief, the OCCA held as follows:

> Finally, Petitioner asks this Court to apply the new rule announced in <u>Anderson v. State</u>, 2006 OK CR 6, 130 P.3d 273, to his case. Oklahoma law provides that for certain enumerated crimes, a defendant must serve at least 85% of any sentence imposed before becoming eligible for any type of early release. In <u>Anderson</u>, this Court held that when a defendant is tried for a crime subject to the 85% Rule, the jury must be given that information. The rule in <u>Anderson</u> applied prospectively, and to any case pending on direct appeal at the time <u>Anderson</u> was announced. <u>Carter v. State</u>, 2006 OK CR 42, ¶ 4, 147 P.3d 243, 244. Petitioner's case was pending on direct appeal at the time

Anderson was decided. However, we have made it clear that failure to instruct on the 85% Rule is not automatic grounds for reversal in every case. Eizember v. State, 2007 OK CR 29, ¶ 73, 164 P.3d 208. 229. As to Count 1, the jury in Petitioner's case had three punishment options – life with the possibility of parole, life without the possibility of parole, and death. It chose the most severe option, to which the notion of parole is irrelevant. We can confidently conclude that, had the jury been instructed on the 85% Rule, that information would not have affected the verdict. See Cole v. State, 2007 OK CR 27, ¶ 65, 164 P.3d 1089, 1102. Proposition I is denied.

Pavatt, No. PCD-2004-25, slip op. at 5-6 (footnote omitted).

Beyond the limited circumstances of Simmons, the Supreme Court has not mandated that a jury be told about a defendant's parole eligibility. In fact, the Supreme Court has specifically acknowledged that the States have discretion in this area. Simmons, 512 U.S. at 168 (citing California v. Ramos, 463 U.S. 992, 1014 (1983), "for the broad proposition that [the Supreme Court] generally will defer to a State's determination as to what a jury should and should not be told about sentencing."). See also Ramdass, 530 U.S. at 165 (acknowledging that O'Dell v. Netherland, 521 U.S. 151, 166 (1997), "reaffirmed that the States have some discretion in determining the extent to which a sentencing jury should be advised of probable future custody and parole status in a future dangerousness case, subject to the rule of Simmons."); O'Dell, 521 U.S. at 166 (noting that Simmons "carved out an exception to the general rule described in Ramos . . . for the first time ever"). Under these circumstances, Petitioner's claim is nothing more than a state law claim, and "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." Estelle v. McGuire, 502 U.S. 62, 67-68 (1991). See also Parker v. Sirmons, 384 F. App'x 750, 752 (10th Cir. 2010) (unpublished) (finding no due process violation for

<u>Anderson</u> error); <u>Gardner v. Jones</u>, 315 F. App'x 87, 91-92 (10th Cir. 2009) (unpublished) (acknowledging the limited holding of <u>Simmons</u> and finding that a petitioner was not denied a fundamentally fair trial "in a constitutional sense" by the trial court's failure to instruct the jury on the 85% Rule); <u>Taylor v. Parker</u>, 276 F. App'x 772, 775-76 (10th Cir. 2008) (unpublished) (failure to instruct on the 85% Rule did result in a fundamentally unfair trial).

For the foregoing reasons, the Court finds that Petitioner's Ground Eight lacks merit. Ground Eight is hereby denied.

## I.     Admission of Photographs and a Video (Ground Nine).

In Ground Nine, Petitioner presents various challenges to the admission of photographs and a video. Much like his prosecutorial misconduct claim in Ground Seven, <u>supra</u>, the Court's review of this ground for relief is dependent upon how each particular claim alleged herein was presented to the OCCA. Due to the varying presentation of these claims to the OCCA, they are either subject to AEDPA review on the merits or are procedurally barred from a merits review.

### 1.     Gruesome Photos.

On direct appeal, Petitioner asserted that he had been denied a fair trial by the admission of gruesome photographs. Without singling out any particular photograph, Petitioner requested the OCCA to review all of the photographs of Rob and find that they "were gruesome and had no place in the trial" because "[t]he State had plenty of evidence that [Rob] was dead." Petitioner requested that he be granted a new trial and/or a new

sentencing proceeding. Brief of Appellant, No. D-2003-1086, pp. 35-36. In denying relief,

the OCCA held as follows:

> In Proposition 8, [Petitioner] claims error when the trial court admitted several photographs of the murder victim at the crime scene. At trial, defense counsel objected generally to the "multitude of bloody photographs" from the crime scene that the State offered to introduce. These photographs depicted Rob Andrew's body on the floor of the garage. He bled to death after being shot twice at close range with a shotgun. The photographs showed the body from various angles. [Petitioner's] objection at trial appears to focus more on the number of photographs rather than their gruesome nature. The trial court admitted many of the photos but did sustain the defense objection to several others.
>
> On appeal, [Petitioner] does not claim the photographs were needlessly cumulative, only that they were gruesome, and therefore "had no place in the trial." We review the trial court's decision to admit crime-scene photographs for an abuse of discretion. DeRosa, 2004 OK CR 19 at ¶ 73, 89 P.3d at 1150. This Court has many times noted that gruesome crimes make for gruesome crime-scene photographs; the issue is whether the probative value of the evidence is substantially outweighed by its prejudicial effect. 12 O.S.2001, §§ 2401–03; Dodd, 2004 OK CR 31 at ¶ 66, 100 P.3d at 1038; Le v. State, 1997 OK CR 55, ¶ 25, 947 P.2d 535, 548. The State was entitled to corroborate and illustrate the testimony of its witnesses about what the crime scene looked like and the manner of death. The record shows that the trial court carefully considered each photograph before admitting it. We find no abuse of discretion here, and this proposition is denied.

Pavatt, 159 P.3d at 289-90.

To the extent Petitioner challenges this determination by the OCCA on direct appeal,

Petitioner has not shown that it is contrary to or an unreasonable application of Supreme

Court law.[38]

---

[38] As Respondent asserts, to the extent Petitioner expounds upon his gruesome photographs claim to argue "that the crime scene photographs, combined with the prosecutor's argument, misled
(continued...)

"Federal habeas review is not available to correct state law evidentiary errors; rather, it is limited to violations of constitutional rights." Smallwood v. Gibson, 191 F.3d 1257, 1275 (10th Cir.1999) (citing Estelle v. McGuire, 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991)). When the habeas petitioner argues that evidence violated the Constitution, we consider "whether the admission of evidence . . . so infected the sentencing proceeding with unfairness as to render the jury's imposition of the death penalty a denial of due process." Romano v. Oklahoma, 512 U.S. 1, 12, 114 S.Ct. 2004, 129 L.Ed.2d 1 (1994). The "Due Process Clause of the Fourteenth Amendment provides a mechanism for relief" when "evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair." Payne v. Tennessee, 501 U.S. 808, 825, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991) (citing Darden v. Wainwright, 477 U.S. 168, 179–83, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986)).

Wilson, 536 F.3d at 1114. Having reviewed the particular photographs Petitioner has singled out for purposes of habeas review (State's Exhibits 58, 63-66, 69, and 73-77) and applying the deference afforded to the OCCA's merits denial, the Court finds that Petitioner is not entitled to relief upon a claim that gruesome photographs denied him a fundamentally fair trial.

---

[38](...continued)
the jury into finding [the] existence of the heinous, atrocious or cruel aggravator," Response, p. 120, this claim extends beyond the claim Petitioner exhausted on direct appeal. Because Petitioner returned to state court and presented this additional claim in his second post-conviction application, it appears that Petitioner does in fact intend it to be an additional claim for relief. In denying Petitioner relief on this additional claim, the OCCA held as follows:

Finally, Petitioner claims the prosecutor improperly used the post-mortem photographs as evidence that the murder was especially heinous, atrocious, or cruel. This argument, based entirely on the trial record, could have been raised in prior proceedings but was not. It cannot be considered at this time. 22 O.S.Supp.2006, §1089(D)(8).

Pavatt, No. PCD-2009-777, slip op. at 5. For the reasons discussed in Ground Two, supra, the Court finds that this additional claim is barred from federal review.

## 2.    State's Exhibit 219 (Live Photograph of Rob).

State's Exhibit 219 is a live photograph of Rob which was admitted at trial without objection pursuant to Okla. Stat. tit. 12, § 2403 (J. Tr. IX, 2150).  Section 2403 provides in pertinent part that "in a prosecution for any criminal homicide, an appropriate photograph of the victim while alive shall be admissible evidence when offered by the district attorney to show the general appearance and condition of the victim while alive."  Despite Oklahoma's evidentiary rule permitting its admission, Petitioner asserts that the admission of this photograph was highly prejudicial and denied him a fundamentally fair trial, and he faults his appellate counsel for failing to raise the issue on appeal.

In his first post-conviction application, Petitioner raised a claim concerning appellate counsel's failure to challenge the admission of State's Exhibit 219. Petitioner asserted that appellate counsel should have challenged its admission on due process grounds and the constitutionality of Section 2403.  Original Application for Post-Conviction Relief, No. PCD-2004-25, pp. 50-54.  In denying relief, the OCCA made two holdings.  One, the claim was barred by res judicata,[39] and two, the claim was without merit given its holding in Marquez-Burrola v. State, 157 P.3d 749 (Okla. Crim. App. 2007).  Pavatt, No. PCD-2004-25, slip op. at 6 & n.6.  Respondent does not argue for the application of a procedural bar, but

---

[39] The OCCA noted that Petitioner's claim against his appellate counsel was the "scope of counsel's argument concerning admission of a 'live' photograph of the victim."  Pavatt, No. PCD-2004-25, slip op. at 6 n.6.  While not entirely clear, it is likely that the OCCA was referring to appellate counsel's challenge to the admission of gruesome photographs. In that proposition, appellate counsel requested that the OCCA "specifically review the photographs of Rob Andrew." Brief of Appellant, No. D-2003-1186, p. 35.

instead asserts that the claim should be given AEDPA deference and denied on the merits. Response, p. 127. In his Reply, Petitioner does not take issue with Respondent's position, but argues that the admission of State's Exhibit 219 was a violation of his constitutional rights. Reply, pp. 79-80.

The Court finds that Petitioner has not shown that the decision of the OCCA denying him relief for this allegation of ineffective assistance of appellate counsel is contrary to or an unreasonable application of <u>Strickland</u>. <u>See</u> Ground Two, <u>supra</u> (discussing the application of <u>Strickland</u> to claims of ineffective assistance of appellate counsel). Although Petitioner asserts that his appellate counsel should have challenged the admission of State's Exhibit 219 pursuant to Section 2403, it is clear that based on the case cited by the OCCA in its denial of Petitioner's claim, <u>Marquez-Burrola</u>, 157 P.3d at 759-61, as well as other cases decided by the OCCA prior to Petitioner's appeal, <u>Glossip v. State</u>, 157 P.3d 143, 156-57 (Okla. Crim. App. 2007), and <u>Coddington v. State</u>, 142 P.3d 437, 452-53 (Okla. Crim. App. 2006), that Petitioner would not have prevailed on appeal had the claim been raised. <u>Robbins</u>, 528 U.S. at 285-86.

### 3. Remaining Evidentiary Challenges (State's Exhibits 46, 118, 184, and 205).

The balance of the evidentiary challenges raised in Petitioner's Ground Nine were not presented to the OCCA until Petitioner's second post-conviction application. Reply, pp. 79-80; Second Application for Post-Conviction Relief, No. PCD-2009-777, pp. 20-27. The OCCA declined to review the merits of these claims but held as follows:

In Proposition 3, Petitioner claims he was denied a fair trial by the combined effect of gruesome photos of the murder victim, and a photo and video evidence showing the victim before his demise. Petitioner concedes that on direct appeal, we rejected his claim that the post-mortem photographs of the victim were not unfairly gruesome. Nevertheless, he claims we have not considered whether the same photos were "unnecessarily cumulative and repetitive." (Petitioner's Application at 20) Petitioner also concedes that pre-mortem visual images of the victim, introduced at trial, were complained about in his previous post-conviction application. The current arguments merely modify or expand claims made, and rejected, in prior proceedings, and are therefore barred by the doctrine of *res judicata*.[FN4] Turrentine v. State, 1998 OK CR 44, ¶ 12, 965 P.2d 985, 989.

> FN4. Petitioner's complaint about the post-mortem photographs is something of a moving target. As we noted on direct appeal, Petitioner's concern at trial was more about the number of photographs than their nature. On direct appeal, Petitioner shifted focus, complaining about the gruesome nature of the photos individually, not about any cumulative adverse effect. We noted that the trial court did exclude some of the proffered photos at defense counsel's request, and concluded that the remaining photos were not unfairly prejudicial. Pavatt, 2007 OK CR 19, at ¶¶ 54-55, 159 P.3d at 289-90.

Pavatt, No. PCD-2009-777, slip op. at 4-5. For the reasons discussed in Ground Two, supra, the Court finds that these claims are barred from federal review.

**4.    Conclusion.**

For the foregoing reasons, the Court finds that Petitioner is not entitled to relief on his Ground Nine. Relief is therefore denied.

**J.    Aggravating Circumstances (Grounds Ten through Fourteen).**

In Grounds Ten through Fourteen, Petitioner raises various challenges to the aggravating circumstances supporting his death sentence. In Oklahoma, a jury's finding of at least one aggravating circumstance makes a defendant eligible for a death sentence;

78

however, before imposing a death sentence, the jury must additionally find that the aggravating circumstances outweigh the mitigating circumstances. Okla. Stat. tit. 21, § 701.11 ("Unless at least one of the statutory aggravating circumstances enumerated in this act is so found or if it is found that any such aggravating circumstance is outweighed by the finding of one or more mitigating circumstances, the death penalty shall not be imposed."). In Petitioner's case, the jury found two aggravating circumstances: (1) that Petitioner "committed the murder for remuneration or the promise of remuneration or employed another to commit the murder for remuneration or the promise of remuneration," Okla. Stat. tit. 21, § 701.12(3); and (2) that "[t]he murder was especially heinous, atrocious, or cruel," Okla. Stat. tit. 21, § 701.12(4) (O.R. XI, 2063). For the reasons set forth below, the Court finds that none of these grounds warrant habeas relief to Petitioner's sentence.

### 1. Insufficient Evidence (Grounds Ten and Twelve).

When reviewing the sufficiency of evidence supporting an aggravating circumstance, the OCCA applies the standard of review set forth in Jackson, 443 U.S. at 319. Thus, the OCCA "consider[s] the evidence in a light most favorable to the State, and determine[s] whether any rational juror could have found the existence of the challenged aggravating circumstance beyond a reasonable doubt." Pavatt, 159 P.3d at 294.

Jackson applies on habeas review as well. Lewis v. Jeffers, 497 U.S. 764, 781 (1990). "Like findings of fact, state court findings of aggravating circumstances often require a sentencer to 'resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" Id. at 782 (quoting Jackson,

443 U.S. at 319). Thus, the Court "'must accept the jury's determination as long as it is within the bounds of reason.'" Lockett v. Trammel [sic], 711 F.3d 1218, 1243 (10th Cir. 2013) (quoting Boltz, 415 F.3d at 1232), cert. denied, ___ U.S. ___, 134 S. Ct. 924 (2014). As noted in Ground Three, supra, in addition to the deference afforded a jury's verdict, the AEDPA adds another layer of deference to the Court's review of a sufficiency claim. See Hooks v. Workman, 689 F.3d 1148, 1166 (10th Cir. 2012) ("We call this standard of review 'deference squared.'") (citation omitted). When reviewing the evidentiary sufficiency of an aggravating circumstance under Jackson, the Court looks to Oklahoma substantive law to determine its defined application. Hamilton v. Mullin, 436 F.3d 1181, 1194 (10th Cir. 2006).

In Ground Ten, Petitioner challenges the sufficiency of the evidence supporting the jury's finding that Rob's murder was especially heinous, atrocious, or cruel. Petitioner contends that the aggravator is not supported by sufficient evidence because Rob's death occurred too quickly and because Brenda's statements to the 911 operator that Rob was conscious, breathing, and trying to talk are simply unbelievable. Petitioner also argues that because the OCCA found otherwise, it is evident that the OCCA applied the incorrect standard of review.

In denying Petitioner relief on direct appeal, the OCCA held as follows:

In Propositions 14 and 15, [Petitioner] challenges the sufficiency of the evidence to support the two aggravating circumstances alleged by the State as warranting the death penalty. Such challenges are reviewed under the same standard as challenges to the evidence supporting a criminal conviction. We consider the evidence in a light most favorable to the State, and determine whether any rational juror could have found the existence of the challenged aggravating circumstance beyond a reasonable doubt. DeRosa, 2004 OK

CR 19 at ¶ 85, 89 P.3d at 1153; <u>Lockett v. State</u>, 2002 OK CR 30, ¶ 39, 53 P.3d 418, 430.

In Proposition 14, [Petitioner] claims the evidence was insufficient to support the jury's finding that the murder of Rob Andrew was "especially heinous, atrocious, or cruel." To establish this aggravator, the State must present evidence from which the jury could find that the victim's death was preceded by either serious physical abuse or torture. Evidence that the victim was conscious and aware of the attack supports a finding of torture. <u>Davis v. State</u>, 2004 OK CR 36, ¶ 39, 103 P.3d 70, 81; <u>Black v. State</u>, 2001 OK CR 5, ¶ 79, 21 P.3d 1047, 1074 (evidence that victim consciously suffered pain during and after stabbing was sufficient to support this aggravating circumstance); <u>Le</u>, 1997 OK CR 55 at ¶ 35, 947 P.2d at 550; <u>Romano v. State</u>, 1995 OK CR 74, ¶ 70, 909 P.2d 92, 118; <u>Berget v. State</u>, 1991 OK CR 121, ¶ 31, 824 P.2d 364, 373. Our evaluation is not a mechanistic exercise. As we stated in <u>Robinson v. State</u>, 1995 OK CR 25, ¶ 36, 900 P.2d 389, 401:

> As much as we would like to point to specific, uniform criteria, applicable to all murder cases, which would make the application of the "heinous, atrocious or cruel" aggravator a mechanical procedure, that is simply not possible. Rather, the examination of the facts of each and every case is necessary in determining whether the aggravator was proved. Unfortunately, no two cases present identical fact scenarios for our consideration, therefore the particulars of each case become the focus of our inquiry, as opposed to one case's similarity to another, in resolving a sufficiency of the evidence claim supporting the heinous, atrocious or cruel aggravator.

The evidence presented at trial showed that Rob Andrew suffered numerous wounds resulting from two shotgun blasts, which damaged his internal organs. The medical examiner testified that either wound would have caused sufficient blood loss to be independently fatal, but that death was not instantaneous. When emergency personnel arrived, Andrew was still clutching a trash bag full of empty aluminum cans, which reasonably suggested that he either tried to ward off his attacker or shield himself from being shot. Brenda Andrew called 911 twice after the shooting; together, the two calls spanned several minutes. During the second call, she claimed that her husband was still conscious and attempting to talk to her as he lay bleeding to death on the garage floor. All of these facts tend to show that Rob Andrew suffered serious physical abuse, and was conscious of the fatal attack for several minutes. <u>See</u> <u>Ledbetter v. State</u>, 1997 OK CR 5, ¶ 53, 933 P.2d 880, 896 (evidence that

murder victim was likely aware that she was about to be assaulted because defendant had attempted to kill her one week earlier, that she tried to defend herself from the fatal attack, and that she attempted to communicate with a neighbor after the attack was sufficient to show that the murder was especially heinous, atrocious or cruel).

After finding that the murder was accompanied by torture or serious physical abuse, the jury may also consider the attitude of the killer and the pitiless nature of the crime. Lott, 2004 OK CR 27 at ¶ 172, 98 P.3d at 358; Phillips v. State, 1999 OK CR 38, ¶ 80, 989 P.2d 1017, 1039. That the victim was acquainted with his killers is a fact relevant to whether the murder was especially heinous, atrocious, or cruel. In finding the murder in Boutwell v. State, 1983 OK CR 17, ¶ 40, 659 P.2d 322, 329 to be especially heinous, atrocious, or cruel, this Court observed:

> In this case the killing was merciless. The robbers planned well in advance to take the victim's life. Even more abhorrent and indicative of cold pitilessness is the fact that the appellant and the victim knew each other.

We find the situation in the present case even more pitiless. Rob Andrew correctly suspected his wife of having an affair with a man he trusted as his insurance agent. He correctly suspected his wife and her lover of trying to wrest control of his life insurance away from him. He correctly suspected his wife and her lover of attempting to kill him several weeks before by severing the brake lines on his car. He confided in others that he was in fear of his life. Having separated from his wife, Rob Andrew was murdered as he returned to the family home to pick up his children for the Thanksgiving holiday. From the evidence, a rational juror could have concluded, beyond a reasonable doubt, that Rob Andrew had time to reflect on this cruel state of affairs before he died. The evidence supported this aggravating circumstance, and this proposition is denied.

Pavatt, 159 P.3d at 294-95.

First, there is no merit to Petitioner's claim that the OCCA applied an incorrect

standard of review. As detailed above, it is clear that the OCCA applied Jackson and that it

was the correct (and constitutional) standard to be applied.[40]  Petitioner's arguments to the

contrary have recently been reviewed and rejected by the Tenth Circuit in <u>Cole v. Trammell</u>,

___ F.3d ___, 2014 WL 595768, at *20-25 (10th Cir. Feb. 18, 2014).  Second, as found by

the OCCA, there was evidence from which the jury could conclude that the aggravator was

satisfied.  The medical examiner testified that Rob did not die instantaneously, that his

injuries would have been painful, and that although Rob would have lost consciousness at

some point due to blood loss, he could have suffered for several minutes.  The medical

examiner even  acknowledged the consistency between his opinion and Brenda's statements

in the second 911 call (J. Tr. X, 2457-58, 2463-64).  As previously noted, in the second 911

call, which ended some six minutes after the first 911 call was made, Brenda said that Rob

was bleeding a lot, but that he was conscious, breathing, and trying to talk (J. Tr. IX, 2148-

49; State's Exhibit 34). Although Petitioner discounts Brenda's statements as unbelievable,

characterizing her 911 calls as "simply poor acting," Petition, p. 149, Respondent correctly

points out that whether to believe Brenda's statements or not was for the jury to decide.

Moreover, pursuant to <u>Jackson</u>, it is axiomatic that the presented evidence is to be viewed

"in the light most favorable to the prosecution."  <u>Jackson</u>, 443 U.S. at 319.  Based on the

presented evidence, and with acute awareness of the double deference applied by the Court

---

[40] In asserting that the OCCA should have applied the reasonable hypothesis test instead of <u>Jackson</u>, Petitioner cites Instruction Number 8 given to the jury regarding its consideration of circumstantial evidence.  However, Petitioner fails to note is that this instruction was given with respect to the continuing threat aggravator only (O.R. XI, 2055).  <u>See</u> OUJI-CR (2d) 4-77 (directing that the applicable aggravating circumstance(s) be inserted).

in the resolution of this claim, the Court finds that Petitioner has not shown that this decision by the OCCA is contrary to or an unreasonable application of Supreme Court law.

In Ground Twelve, Petitioner challenges the sufficiency of the evidence supporting the jury's finding that Rob's murder was committed for remuneration or the promise of remuneration. Petitioner argues that the aggravator is not supported by sufficient evidence because there was no evidence that he would reap financial gain from Rob's death. He contends that even if Brenda was motivated to kill Rob for the insurance money, her motive cannot support the finding of the aggravator in his case. Petitioner additionally claims that Oklahoma's remuneration aggravator is unconstitutionally vague, and as with his challenge to the especially heinous, atrocious, or cruel aggravator, Petitioner also argues that the OCCA applied the incorrect standard of review to deny him relief.[41]

Like Petitioner's challenge to the sufficiency of the evidence supporting the especially heinous, atrocious, or cruel aggravator, the OCCA applied the <u>Jackson</u> standard of review to deny Petitioner relief on this challenge as well. <u>Pavatt</u>, 159 P.3d at 294. Applying <u>Jackson</u>, the OCCA held as follows:

> In Proposition 15, [Petitioner] contends the evidence is insufficient to support the jury's finding that the murder was motivated by "remuneration or the promise of remuneration," as defined by 21 O.S.2001, § 701.12(3).[FN19] Relying on <u>Boutwell</u>, 1983 OK CR 17 at ¶¶ 30–38, 659 P.2d at 328–29, and <u>Johnson v. State</u>, 1982 OK CR 37, ¶¶ 38–41, 665 P.2d 815, 824, [Petitioner]

---

[41] Respondent asserts that Petitioner has not fully exhausted his Ground Twelve. Response, p. 140. Nevertheless, Respondent has addressed all aspects of Petitioner's Ground Twelve and urged denial on the merits. Despite exhaustion issues, the Court believes that disposal of Petitioner's claim on the merits is the easier course. <u>See</u> 28 U.S.C. § 2254(b)(2).

claims that this aggravating circumstance should not apply to every situation where a murder was accompanied by some sort of financial gain, but rather, only where the murder was "primarily" motivated by the hope of financial gain.[FN20]

> FN19. This statute defines the aggravating circumstance as follows: "The person committed the murder for remuneration or the promise of remuneration or employed another to commit the murder for remuneration or the promise of remuneration."

> FN20. [Petitioner] relies on this passage from <u>Johnson</u>: "Murder for remuneration has also been applied to killings motivated primarily to obtain proceeds from an insurance policy, murder of a testator in order to secure a devise or legacy, and killings which occur in a kidnapping-extortion situation." <u>Johnson</u>, 1982 OK CR 37 at ¶ 40, 665 P.2d at 824.

Both <u>Boutwell</u> and <u>Johnson</u> involved murder during the commission of an armed robbery. In each case, we held that the "murder for remuneration" aggravator should not be read so broadly as to apply to every situation where a person was killed during a pursuit for money or property, such as an armed robbery. However, we have held that the aggravator is squarely applicable where the killing was motivated by the hope of receiving life insurance proceeds. <u>See e.g.</u> <u>Stemple</u>, 2000 OK CR 4 at ¶¶ 2–10, 65, 994 P.2d at 65–66, 73 (evidence that defendant, who was having an extramarital affair, arranged to have his wife killed and hoped to collect life insurance proceeds held sufficient to establish this aggravating circumstance); <u>see also</u> <u>Plantz</u>, 1994 OK CR 33 at ¶¶ 41–42, 876 P.2d at 281 and <u>Bryson v. State</u>, 1994 OK CR 32, ¶ 50, 876 P.2d 240, 258–59 (evidence sufficient to support "murder for remuneration" aggravator, where wife (Plantz) and her boyfriend (Bryson) conspired and actually carried out plan to kill husband with the hope of obtaining insurance proceeds). The reason seems obvious to us and clearly within the letter and spirit of § 701.12(3).[FN21]

> FN21. Other jurisdictions have reached similar conclusions based on their own capital sentencing schemes. <u>Cf.</u> <u>People v. Michaels</u>, 28 Cal.4th 486, 122 Cal.Rptr.2d 285, 49 P.3d 1032, 1052 (2002) ("A killing for the purpose of obtaining life insurance benefits, as contrasted with a killing during a burglary or robbery, falls squarely within the scope of the financial gain special circumstance"); <u>Fitts v. State</u>, 982 S.W.2d 175, 188 (Tex.App.1998) (capital sentencing factor

involving motive of "remuneration" or "promise of remuneration" is "not limited to murder-for-hire situations," but encompasses "a broad range of situations, including compensation for loss or suffering and the idea of a reward given or received because of some act"); see also State v. Chew, 150 N.J. 30, 695 A.2d 1301, 1312 (1997) ("[A]lmost every jurisdiction that has considered a broadly-worded pecuniary gain [capital sentencing] factor has applied the factor to killings to collect insurance proceeds").

[Petitioner] reads a passage in Johnson as requiring that the State to prove that financial gain was the "primary" motive for the murder. We disagree. Section 701.12(3) does not require the State to prove a financial motive to the exclusion or diminution of other possible motives. When read in context, the word "primarily" as used in Johnson distinguishes cases where the murder was merely incidental to a robbery or similar attempt to obtain property, as was the case in Johnson and Boutwell. We find the situation in the companion cases of Bryson and Plantz more analogous, and language from Plantz readily applicable here:

> Evidence in the present case showed that the crime was motivated by financial gain. It was committed after the opportunity of weeks of reflection. It was not a crime of passion, nor was the murder committed as an afterthought while Appellant was in the course of committing another felony offense, such as robbery or burglary. The fact that Appellant was apprehended before she could actually collect the money does not obviate this aggravating circumstance.

Plantz, 1994 OK CR 33 at ¶ 42, 876 P.2d at 281 (emphasis added).

As in Plantz, the evidence in this case supports a finding that the murder of Rob Andrew was motivated by a desire to remove the third side of a love triangle, and reap financial gain from insurance proceeds in the process. The life insurance proceeds were no afterthought in this case. [Petitioner] was not only having an affair with the victim's wife; he was the victim's life insurance agent as well. As such, he was particularly well-positioned to try to transfer ownership of Rob Andrew's life insurance policy to Brenda in the months before the murder.

[Petitioner] claims that as a mere paramour, he had no standing to benefit directly from any proceeds Brenda might receive. We find no merit to this argument either. The evidence showed that [Petitioner] hoped to enjoy a

life with Brenda Andrew and her children without Rob Andrew's interference. [Petitioner] clearly hoped to partake of the insurance proceeds, even if he was not a contractual beneficiary. See Bryson, 1994 OK CR 32 at ¶ 50, 876 P.2d at 259. A rational juror could easily have found that the murder was committed with the hope of remuneration. DeRosa, 2004 OK CR 19 at ¶ 85, 89 P.3d at 1153. This proposition is denied.

Pavatt, 159 P.3d at 295-96.

As to the claim Petitioner raised on direct appeal, Petitioner's argument that there is simply insufficient evidence to support the remuneration aggravator, the Court finds that Petitioner has not shown that the OCCA's resolution of the claim is contrary to or an unreasonable application of Jackson. In the first stage, the jury found Petitioner guilty of conspiring with Brenda to kill Rob. As even Petitioner acknowledged on direct appeal, "the evidence of a conspiracy between himself and Brenda Andrew was an important part of the State's claim, in the *capital sentencing phase* of the trial, that the murder was committed for remuneration." Pavatt, 159 P.3d at 281. The evidence showed that Petitioner conspired with Brenda to make her the owner of Rob's $800,000 life insurance policy so that she could remain the primary beneficiary of the policy upon Rob's death. The evidence also showed that Petitioner was a participant in a prior attempt to take Rob's life a month before the actual murder. Both Brenda and Petitioner expressed their hatred for Rob, and it was clear that they both wanted Rob dead so that they could move on with their lives together. Because Brenda was appalled at the suggestion of even having to take on a part time job (J. Tr. VI, 1468-69) and Petitioner was burdened with a substantial amount of credit card debt (J. Tr. VI, 1672-73; J. Tr. XI, 2763-67), neither had the financial means to live in the manner Brenda was

accustomed to living.[42]  Brenda wished that Rob "would just die so she could get the money and go on with her life" (J. Tr. VI, 1469-70), and according to Petitioner, life after Rob included Petitioner and Brenda getting married and having a child together (J. Tr. XI, 2835-36).  Given all of this evidence, the Court finds that the OCCA's decision upholding the jury's determination that Petitioner killed Rob for remuneration or the promise of remuneration is  a reasonable one.  Given the deference afforded to the jury by Jackson as well as the AEDPA deference afforded to the OCCA's decision, Petitioner has not shown that he has been subjected to an "'extreme malfunction[]'" for which the great writ exists.  Richter, 131 S. Ct. at 786.

Beyond his direct appeal claim, Petitioner makes additional arguments which are unmeritorious as well.  First, as in his Ground Ten, Petitioner argues that the OCCA applied the wrong standard of review to his claim.  Petitioner asserts that the OCCA should have applied the reasonable hypothesis test instead of Jackson's rational juror test.  For reasons previously noted in the denial of this same argument raised in Petitioner's Ground Ten, the Court finds no merit to the argument here.  Second, Petitioner argues that Oklahoma's remuneration aggravator is unconstitutionally vague.  However, vagueness review is very deferential, and "[a]s long as an aggravating factor has a core meaning that criminal juries should be capable of understanding, it will pass constitutional muster."  Jones v. United States, 527 U.S. 373, 400 (1999) (citing Tuilaepa v. California, 512 U.S. 967, 973 (1994)).

_____

[42] Brenda admitted that she only stayed with Rob over the years because of the money.  She did not want to lose her house and have to get a job (J. Tr. VI, 1468-69).

Although Petitioner argues that the jury should have received an additional defining instruction on the remuneration aggravator, the Court finds that the jury was capable of understanding the remuneration aggravator by its plain language (O.R. XI, 2051). Finally, Petitioner argues that the OCCA incorrectly applied an accomplice theory of liability to find sufficient evidence supporting the remuneration aggravator in his case. Petition, p. 167. However, there is no indication in the OCCA's opinion that it did so, and in any event, the Court finds that Petitioner has not shown that any such application would be improper.[43]

For the foregoing reasons, the Court finds that Petitioner has not established his right to relief on his Grounds Ten and Twelve. Accordingly, relief on these grounds is denied.

### 2. Challenges to the Especially Heinous, Atrocious, or Cruel Aggravator (Grounds Eleven and Thirteen).

In Ground Eleven, Petitioner complains about the instruction given to the jury regarding its consideration and application of the especially heinous, atrocious, or cruel aggravator (O.R. XI, 2052). Petitioner asserts error because the instruction failed to inform

---

[43] In support of his position, Petitioner cites only to a footnote contained in Hawkins v. State, 891 P.2d 586 (Okla. Crim. App. 1994). In Hawkins, the OCCA did not find serious physical abuse, one of the prerequisites to finding the especially heinous, atrocious, or cruel aggravator, based on actions committed by Hawkins' co-defendant. The OCCA explained as follows: "We do not consider the multiple rapes of the victim while she was held captive in the barn, for the appellant did not commit them, and the record contains no evidence to connect him to them in any way." Hawkins, 891 P.2d at 597 n.3. Contrary to Petitioner's assertion, this footnote does not foreclose the application of accomplice liability for an aggravating circumstance. Hawkins does, however, stand for the proposition that a defendant cannot be held liable for an aggravating circumstance when the evidence fails to connect him in any way to the acts committed by his co-defendant. In Petitioner's case, there is no doubt that Petitioner was connected to the acts committed by Brenda as they conspired to kill Rob for the insurance proceeds. In addition, the Court notes Respondent's citation to authority that the OCCA has applied accomplice liability in other cases to find the satisfaction of an aggravating circumstance. Response, p. 147.

the jury that prior to finding the especially heinous, atrocious, or cruel aggravator, it was required to find the existence of conscious physical suffering beyond a reasonable doubt. In Ground Thirteen, Petitioner challenges Oklahoma's especially heinous, atrocious, or cruel aggravator on the ground that it is unconstitutionally vague on its face. Both of these claims, however, were not presented to the OCCA until Petitioner's second post-conviction application. Reply, pp. 90, 103 n.20; Second Application for Post-Conviction Relief, No. PCD-2009-777, pp. 27-32. The OCCA declined to review the merits of these claims because each could have been raised in Petitioner's first post-conviction application. Pavatt, No. PCD-2009-777, slip op. at 5-6 (citing Title 22, Section 1089(D)(8)). For the reasons discussed in Ground Two, supra, the Court finds that these claims are barred from federal review.

Nevertheless, the Court additionally finds that neither ground has merit. With respect to Ground Eleven, the Court notes that in addition to applying a procedural bar to Petitioner's claim, the OCCA also noted the lack of merit to the claim as follows:

> In any event, we have rejected the same argument several times in the past. Petitioner essentially asks this Court to retroactively require an instruction that we promulgated – after Petitioner's conviction – in DeRosa v. State, 2004 OK CR 19, ¶¶ 91-97, 89 P.3d 1124, 1154-57. That instruction elaborates on the meaning of "heinous, atrocious, or cruel," and the relevant Uniform Jury Instruction already in existence (No. 4-73) was amended a year later. DeRosa was handed down several months after Petitioner's trial. DeRosa does not hold that the Uniform Jury Instruction on this issue, being used at the time of DeRosa's and Petitioner's trials, was materially deficient. DeRosa, 2004 OK CR 19, ¶ 97, 89 P.3d at 1156 ("This opinion should not be interpreted as a ruling that the former uniform instruction was legally inaccurate or inadequate"). This same attack on the pre-DeRosa version of OUJI-CR (2nd) No. 4-73 has been rejected several times by this Court.

Jackson v. State, 2006 OK CR 45, ¶¶ 36-38, 146 P.3d 1149, 1161-63; Browning v. State, 2006 OK CR 6, ¶¶ 52-56, 134 P.3d 816, 843-45; Rojem v. State, 2006 OK CR 7, ¶¶ 68-73, 130 P.3d 287, 300-01.

Pavatt, No. PCD-2009-777, slip op. at 5 n.5. With respect to Ground Thirteen, the OCCA likewise noted that it had "rejected the same argument many times in the past." Id. at 6 n.6 (citing Cole v. State, 2007 OK CR 27, ¶ 37, 164 P.3d 1089, 1098)).

In order to satisfy the Eighth Amendment, an aggravating circumstance must meet two requirements: (1) it may not apply to every defendant convicted of murder; and (2) it may not be unconstitutionally vague. Tuilaepa, 512 U.S. at 972. As Petitioner duly notes, in 1987, the Tenth Circuit found that Oklahoma's especially heinous, atrocious, or cruel aggravator as then applied violated both of these requirements, Cartwright v. Maynard, 822 F.2d 1477 (10th Cir. 1987), and the Supreme Court agreed, Maynard v. Cartwright, 486 U.S. 356 (1988). However, even before the Supreme Court issued its decision, Oklahoma narrowed its application. In Stouffer v. State, 742 P.2d 562, 563 (Okla. Crim. App. 1987), Oklahoma "restrict[ed] its application to those murders in which torture or serious physical abuse is present." Consistent with this change, the jury in Petitioner's case was specifically instructed that the aggravator was applicable "where the death of the victim was preceded by torture of the victim or serious physical abuse" (O.R. XI, 2052). See Maynard, 486 U.S. at 365 (acknowledging that limiting the heinous, atrocious, or cruel aggravator to cases involving some kind of torture or serious physical abuse would be constitutionally acceptable). As Respondent aptly notes, Response, p. 139 n. 15, since Oklahoma's imposition of a more narrow construction, the Tenth Circuit has repeatedly approved of the

same, including the very instruction administered in this case. <u>Wilson</u>, 536 F.3d at 1108;

<u>Workman v. Mullin</u>, 342 F.3d 1100, 1115-16 (10th Cir. 2003); <u>Hooks v. Ward</u>, 184 F.3d

1206, 1239-40 (10th Cir. 1999). <u>See also Miller</u>, 354 F.3d at 1300 (acknowledging and

listing cases in which the Tenth Circuit has upheld Oklahoma's heinous, atrocious, or cruel

aggravator since <u>Maynard</u>); <u>Medlock</u>, 200 F.3d at 1321 ("We have held that the 'heinous,

atrocious, or cruel' aggravating circumstance as narrowed by the Oklahoma courts after

<u>Maynard</u> to require torture or serious physical abuse characterized by conscious suffering can

provide a principled narrowing of the class of those eligible for death."). While Petitioner

has argued otherwise, he has not presented any valid argument to overcome this abundant

and controlling authority.

**3. Appellate Counsel Ineffectiveness (Ground Fourteen).**

In Ground Fourteen, Petitioner argues that Supreme Court authority[44] requires

Oklahoma capital juries to find beyond a reasonable doubt that the aggravating circumstances

outweigh the mitigating circumstances and he faults his appellate counsel for not raising this

claim on direct appeal. Petitioner presented this claim to the OCCA in his first application

---

[44] Petitioner cites to <u>Jones v. United States</u>, 526 U.S. 227 (1999), <u>Apprendi v. New Jersey</u>, 530 U.S. 466 (2000), and <u>Ring v. Arizona</u>, 536 U.S. 584 (2002). In <u>Jones</u>, the Supreme Court interpreted the federal carjacking statute as setting forth three separate offenses, "each of which must be charged by indictment, proven beyond a reasonable doubt, and submitted to a jury for its verdict." <u>Jones</u>, 526 U.S. at 252. In <u>Apprendi</u>, the Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." <u>Apprendi</u>, 530 U.S. at 490. In <u>Ring</u>, the Court applied <u>Apprendi</u> to capital defendants. "Capital defendants, no less than noncapital defendants, . . . are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." <u>Ring</u>, 536 U.S. at 589.

for post-conviction relief. Original Application for Post-Conviction Relief, No. PCD-2004-25, pp. 70-76.  Because the OCCA denied relief upon a merits application of <u>Strickland</u>, Respondent asserts that Petitioner has failed to show that the OCCA's decision is contrary to or an unreasonable application of <u>Strickland</u>.

In denying Petitioner relief on his claim, the OCCA found that appellate counsel was not deficient in failing to raise this claim because the claim had no merit.  The OCCA referenced its decision in <u>Wood v. State</u>, 158 P.3d 467, 475 (Okla. Crim. App. 2007), wherein it rejected the very argument Petitioner contends his appellate counsel should have made.  <u>Pavatt</u>, No. PCD-2004-25, slip op. at 7 n.7.  In <u>Wood</u>, 158 P.3d at 475, the OCCA not only noted the lack of merit to the claim, but it also noted its repeated rejection of the claim in at least four other published cases.

In addition to the ample OCCA authority on the issue, the Tenth Circuit has also addressed the issue and specifically rejected it as well in both <u>Lockett</u>, 711 F.3d at 1252-55, and <u>Matthews v. Workman</u>, 577 F.3d 1175, 1195 (10th Cir. 2009).  While acknowledging this contrary authority, Petitioner's position is simply that both courts are wrong because their decisions are contrary to <u>Ring</u>.  Reply, p. 109.  The Court disagrees.

In <u>Ring</u>, the Supreme Court addressed a capital defendant's right to a jury trial.  The Court reviewed an Arizona procedure which allowed the trial judge, alone and after a jury verdict finding a defendant guilty of first degree murder, to determine the appropriate sentence.  Under Arizona law, a death sentence could not be imposed unless at least one aggravating circumstance was found beyond a reasonable doubt. <u>Ring</u>, 536 U.S. at 588, 597.

At the sentencing hearing, to be conducted by the same judge who tried the case, the judge was directed to evaluate both the aggravating and mitigating circumstances.  The judge was then authorized to impose a sentence of death "only if there is at least one aggravating circumstance and 'there are no mitigating circumstances sufficiently substantial to call for leniency.'" Id. at 593 (citation omitted). The judge found two aggravating circumstances and one mitigating circumstance.  Finding that the mitigating circumstance did not warrant leniency, the judge sentenced Ring to death.  Id. at 594-95.

The Supreme Court found that Arizona's capital procedure violated the Sixth Amendment.  "If a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact – no matter how the State labels it – must be found by a jury beyond a reasonable doubt." Id. at 602.  Because Arizona law provides that a death sentence is unauthorized in the absence of at least one aggravating circumstance, the Court found that "Arizona's enumerated aggravating factors operate as 'the functional equivalent of an element of a greater offense,'. . . [and therefore] the Sixth Amendment requires that they be found by a jury." Id. at 609 (quoting Apprendi) (citation omitted).

Ring's focus is on death eligibility, not the ultimate, highly discretionary sentencing decision.  The issue in Ring was the judicial determination of the prerequisite for the death penalty – that particular finding which allowed the defendant's sentence to be enhanced.  While the judge in Ring not only made this finding but weighed the aggravators and mitigators as well, the Supreme Court did not address this additional consideration or in any way imply that the weighing process was subject to its holding.  In addition, Supreme Court

precedent establishes "that a State enjoys a range of discretion in imposing the death penalty, including the manner in which aggravating and mitigating circumstances are to be weighed." Kansas v. Marsh, 548 U.S. 163, 174 (2006). The Supreme Court has "'never held that a specific method for balancing mitigating and aggravating factors in a capital sentencing proceeding is constitutionally required.'" Id. at 175 (quoting Franklin v. Lynaugh, 487 U.S. 164, 179 (1988)). In the present case, the jury found beyond a reasonable doubt two aggravators which supported the imposition of a death sentence (O.R. XI, 2063). Supreme Court precedent requires nothing more.

The Tenth Circuit reached this same conclusion in Matthews. In Matthews, an Oklahoma capital habeas petitioner, relying on both Apprendi and Ring, argued that his jury should have been instructed to find that the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt. Without this determination, Matthews argued his death sentence was invalid. Relying on its decision in United States v. Barrett, 496 F.3d 1079, 1107 (10th Cir. 2007), the Tenth Circuit found no merit to the claim. In particular, the Court found that the jury's weighing of the factors in aggravation and mitigation "is not a finding of fact subject to Apprendi but a 'highly subjective, largely moral judgment regarding the punishment that a particular person deserves.'" Matthews, 577 F.3d at 1195 (quoting Barrett). In Lockett, 711 F.3d at 1252-55, the Tenth Circuit reaffirmed its position on this issue.

In light of the foregoing authority, the Court finds that Petitioner has not shown that the decision of the OCCA denying him relief for this allegation of ineffective assistance of

appellate counsel is contrary to or an unreasonable application of <u>Strickland</u>. <u>See</u> Ground Two, <u>supra</u> (discussing the application of <u>Strickland</u> to claims of ineffective assistance of appellate counsel). Because the underlying claim which Petitioner faults his appellate counsel for not raising is without merit under both OCCA and Tenth Circuit precedent, it is abundantly clear that the OCCA reasonably concluded that appellate counsel had not been deficient in failing to raise this claim on direct appeal. <u>See</u> <u>Freeman v. Att'y Gen.</u>, 536 F.3d 1225, 1233 (11th Cir. 2008) ("A lawyer cannot be deficient for failing to raise a meritless claim. . . ."); <u>Snow</u>, 474 F.3d at 724-25 (trial counsel was not ineffective for failing to object to certain evidence which the OCCA found admissible); <u>Spears</u>, 343 F.3d at 1249 (trial counsel was not ineffective for failing to object to the giving of a flight instruction where the OCCA found that sufficient evidence supported the giving of the instruction).

### 4. Conclusion.

For the foregoing reasons, the Court denies relief to Petitioner on his Grounds Ten, Eleven, Twelve, Thirteen, and Fourteen. Having found that none of Petitioner's challenges to the aggravating circumstances supporting his death sentence warrant habeas relief, Petitioner's request to be relieved of his death sentence is hereby denied.

### K. Ineffective Assistance of Trial and Appellate Counsel (Ground Fifteen).

In Ground Fifteen, Petitioner alleges nine instances of trial counsel ineffectiveness and nineteen instances of appellate counsel ineffectiveness. For the reasons set forth below, the Court finds that none of these grounds warrant habeas relief.

### 1.    Trial Counsel Ineffectiveness.[45]

Three of Petitioner's nine allegations of trial counsel ineffectiveness are clearly procedurally barred from habeas review because Petitioner did not present them to the OCCA until his second post-conviction application.   As even Petitioner himself acknowledges, Petitioner's first, second, and eighth instances concerning trial counsel's (1) failure to adequately challenge Petitioner's confession letter (State's Exhibit 222) (Petitioner's "B"), (2) failure to adequately challenge the State's forensic bullet evidence (Petitioner's "C"), and (3) failure to conduct a meaningful mitigation investigation and present a meaningful mitigation case (Petitioner's "I") had not been presented to the OCCA at the time he filed his Petition but were thereafter presented in a second post-conviction application filed in 2009. Reply, pp. 120, 124, 132-33; Second Application for Post-Conviction Relief, No. PCD-2009-777, pp. 34-37, 39-48.   The OCCA denied relief on these claims because all were capable of being presented in his original application for post-conviction relief.  Pavatt, No. PCD-2009-

---

[45] Throughout the pleadings, the parties have debated whether Petitioner had the same counsel at trial and on appeal and how that determination affects the Court's consideration of various claims. The parties' obvious concern is the application of the Tenth Circuit's decision in English v. Cody, 146 F.3d 1257 (10th Cir. 1998).  In English, the Tenth Circuit found that "[t]he Oklahoma requirement that a claim of ineffective assistance of trial counsel be raised on direct appeal is an adequate ground for procedural default if (1) the defendant's counsel on direct appeal is different from trial counsel and (2) the claims can be resolved on the trial record alone." Welch v. Workman, 639 F.3d 980, 1012 (10th Cir. 2011) (citing English, 146 F.3d at 1263). The Court need not decide whether Petitioner had the same counsel at trial and on appeal because English is simply not applicable here. English addresses the adequacy of a procedural bar to ineffective assistance of trial counsel claims not raised on direct appeal, and the Court has not barred any of Petitioner's trial counsel claims for this reason.  Many of Petitioner's trial counsel ineffectiveness claims have been barred due to Petitioner's failure to present them in his first post-conviction application.  English does not prevent the application of this procedural default.

777, slip op. at 6-7 (citing § 1089(D)(8)).  For the reasons discussed in Ground Two, <u>supra</u>, the Court finds that these claims are barred from federal review.

Petitioner's third through seventh instances require more discussion due to their relation to other claims raised in the Petition.  In his third instance (Petitioner's "D"), Petitioner asserts that his trial counsel was ineffective for failing to object to all of the hearsay evidence admitted against him.  In support of this claim, Petitioner refers to his second ground for relief.  In Ground Two, Petitioner, with reference to thirty-five hearsay statements detailed therein, claims that his trial counsel was ineffective for failing to object to the admission of this testimony.  Petition, pp. 70-72.  However, in adjudication of Ground Two, <u>supra</u>, the Court found that Petitioner did not raise a claim regarding his trial counsel's ineffectiveness with relation to the hearsay evidence until his second post-conviction application.  Thus, for the reasons fully set out therein, the Court has already determined this instance of trial counsel ineffectiveness to be procedurally barred.

In his fourth instance (Petitioner's "E"), Petitioner asserts that his trial counsel was ineffective for failing to object to the admission of live photographs of Rob.  In Ground Nine, Petitioner raises an evidentiary challenge to the admission of this evidence.  Respondent correctly points out that although Petitioner raised an *appellate counsel* claim with respect to *one* of these photos (State's Exhibit 219), <u>see</u> Ground Nine, <u>supra</u>, he did not allege that his trial counsel was ineffective in any way with respect to these photographs until his second post-conviction relief application.  Second Application for Post-Conviction Relief, No. PCD-2009-777, pp. 37-38.  The OCCA denied relief on this claim because it was capable of being

presented in his original application for post-conviction relief.  <u>Pavatt</u>, No. PCD-2009-777, slip op. at 6-7 (citing § 1089(D)(8)).  Therefore, for the reasons discussed in Ground Two, <u>supra</u>, the Court finds that this claim is barred from federal review as well.

In his fifth instance of trial counsel ineffectiveness (Petitioner's "F"), and with relation to Ground One, Petitioner asserts that although trial counsel renewed his request for a change of venue at the start of the trial, he failed to provide the trial court with "evidence of the extensive and continuing media coverage that occurred after the change of venue hearing, but before the jury was seated." Petition, p. 197.  Respondent asserts that this claim, along with a claim of appellate counsel ineffectiveness as well, was presented to the OCCA in Petitioner's original application for post-conviction relief.  Original Application for Post-Conviction Relief, No. PCD-2004-25, pp. 29-32.  In denying relief, the OCCA made two holdings.  One, the claim was barred by res judicata, and two, the claim was without merit because "the record shows that those who actually served on Petitioner's jury could be fair and impartial. . . ." <u>Pavatt</u>, No. PCD-2004-25, slip op. at 6 & n.6 (citing <u>Pavatt</u>, 159 P.3d at 280).  Respondent does not argue for the application of a procedural bar, but instead asserts that the claim should be given AEDPA deference and denied on the merits.  Response, pp.159-60.  In his Reply, Petitioner asserts that the OCCA's determination of this claim is unclear and therefore no deference should be applied.  Reply, pp. 117-18.

Regardless of the deference applied to this claim, however, the Court finds itself in agreement with the OCCA's ultimate conclusion.  As previously noted in Ground One, <u>supra</u>, despite extensive pretrial publicity, an examination of the voir dire proceedings clearly shows

that the impact on the jury pool was surprisingly less than what would have been expected, and because the trial court was able to seat an impartial jury, the Court cannot conclude that trial counsel's failure to provide the trial court with evidence of the intervening pretrial publicity was either deficient or prejudicial.[46] Relief on this fifth instance is therefore denied.

In his sixth instance of trial counsel ineffectiveness (Petitioner's "G"), and with relation to Ground Eight, Petitioner faults his trial counsel for not following through with requests for jury instructions which would have further defined for the jury the meanings of life and life without parole. Respondent asserts that this claim is unexhausted because it was not presented on direct appeal or in Petitioner's original application for post-conviction relief. Response, p. 161. In his Reply, Petitioner does not address the matter of exhaustion, and unlike other claims, Petitioner does assert that this claim was presented in his second post-conviction application. Reply, pp. 129-30. Because it is clear that Petitioner has never presented this claim to the OCCA and because presentation of the claim now in a third post-conviction application would be undoubtedly barred, the Court finds that this claim is subject to an anticipatory procedural bar. Lott, 705 F.3d at 1179.

In his seventh instance of trial counsel ineffectiveness (Petitioner's "H"), and with relation to Ground Seven, Petitioner asserts that his trial counsel was ineffective in failing

---

[46] As noted in Ground One, the trial judge, as a member of the community herself, was very mindful of the media attention the case was receiving (M. Tr. 7/24/03, 5; J. Tr. I, 58). Therefore, while presentation of additional evidence of the pretrial publicity may have been optimal, it was not ultimately detrimental to the trial court's decision to proceed to voir dire (or in the case of appellate counsel's ineffectiveness, the absence of this evidence on appeal did not affect the outcome of Petitioner's appeal).

to object to the claims of prosecutorial misconduct set forth in his Ground Seven. In Ground Seven, Petitioner details eight claims of prosecutorial misconduct. A review of these claims reveals that (1) trial counsel objected to the third claim regarding the testimony of Agent Stoner; (2) Petitioner raised on direct appeal the issue of trial counsel ineffectiveness with respect to the sixth, seventh, and eighth claims; (3) Petitioner raised in his second post-conviction application the issue of trial counsel ineffectiveness with respect to his first, second, and fifth claims; and (4) Petitioner has never raised the fourth claim, substantively or through a claim of trial counsel ineffectiveness. Accordingly, the Court finds as follows: (1) because trial counsel objected to Agent Stoner's testimony, there is no related claim of trial counsel ineffectiveness to address; (2) Petitioner has not shown that the OCCA was unreasonable in its application of Strickland to Petitioner's claim that trial counsel was ineffective for failing to object to his sixth, seventh, and eighth claims of prosecutorial misconduct;[47] (3) because Petitioner did not challenge trial counsel's ineffectiveness with

_____

[47] In denying Petitioner relief, the OCCA held as follows:

[Petitioner's] ineffective-counsel claim fails as well. To prevail on this claim, [Petitioner] must demonstrate that (1) counsel acted in a professionally unreasonable manner by failing to object to the prosecutor's comments, and (2) a reasonable possibility exists that a different sentencing outcome would have resulted if counsel had objected. Strickland v. Washington, 466 U.S. 668, 687–89, 104 S. Ct. 2052, 2064–65, 80 L.Ed.2d 674 (1984); Dodd, 2004 OK CR 31 at ¶ 112, 100 P.3d at 1049. As we have found that the prosecutor's comments were not improper, any defense objection to them would have been properly overruled and the ultimate outcome unchanged. Defense counsel was not ineffective for failing to object to comments which were not objectionable. Short v. State, 1999 OK CR 15, ¶ 85, 980 P.2d 1081, 1106–07. These propositions are denied.

(continued...)

respect to his first, second, and fifth claims of prosecutorial misconduct until his second post-conviction application, this claim is procedurally barred;[48] and (4) because Petitioner has never challenged trial counsel's actions with respect to his fourth claim of prosecutorial misconduct, it is subject to an anticipatory procedural bar, Lott, 705 F.3d at 1179.

In his final instance of trial counsel ineffectiveness (Petitioner's "J"), Petitioner alleges that his trial counsel was ineffective for a comment made during second stage argument.[49] Petitioner also contends that his trial counsel was ineffective with respect to a comment made by a second stage mitigation witness.

The ineffectiveness issue regarding trial counsel's comment was raised on direct appeal and denied by the OCCA on the merits as follows:

> In Proposition 13, [Petitioner] claims trial counsel rendered deficient performance through a single comment made in punishment-stage opening statement:
>
>> May it please the Court, Counsel, ladies and gentlemen of the jury. I think this task is probably one of the hardest for a defense attorney to do because it puts you in a position of talking to a jury that obviously didn't agree with your assertion of your defense. But nonetheless it's my obligation to stand here and to go over some of the same issues that we've had to talk about before.

---

[47](...continued)
Pavatt, 159 P.3d at 292 (footnote omitted).

[48]  The OCCA denied relief on this claim because it was capable of being presented in his original application for post-conviction relief.  Pavatt, No. PCD-2009-777, slip op. at 6-7 (citing § 1089(D)(8)).

[49] The multiple references to the comment being made as a part of trial counsel's opening statement are inaccurate.  The comment was made during second stage closing argument (J. Tr. XV, 3758).

We first consider whether counsel's comment was professionally unreasonable, and if so, whether there is a reasonable possibility that the comment affected the outcome of the punishment stage. Strickland, 466 U.S. at 687–89, 104 S. Ct. at 2064–65, 80 L.Ed.2d 674. [Petitioner] contends that in this comment, defense counsel conceded that he was only advocating for [Petitioner] out of obligation, and that the death penalty was a foregone conclusion. We disagree on both counts.

Counsel's comment was typical of those often seen in bifurcated trials (where the issue of punishment is reserved until after a finding of guilt), and in capital cases in particular. In those situations, the defendant and his counsel must eventually abandon the fight over guilt or innocence, accept the jury's verdict on that score, and move on to arguments related to punishment. The "obligation" counsel refers to in the quoted passage is clearly not an obligation to defend a person he believes his guilty or deserving of the death penalty. As we read the passage, counsel was simply reiterating his belief in his client's cause, and expressing disappointment that the jury did not share his belief.

Nor do we read counsel's comment as a concession that the death penalty was inevitable. Rather, counsel was asking the jurors to indulge his references to guilt-stage evidence, even though they had rejected the defense theory, because some of that evidence was relevant to punishment as well.[FN18] Far from being any sort of concession, counsel's comment evinced an unflagging determination to defend his client. Counsel's comment was neither unreasonable, unprofessional, nor prejudicial. Strickland, 466 U.S. at 687–89, 104 S. Ct. at 2064–65, 80 L.Ed.2d 674 (1984); Kelsey v. State, 1987 OK CR 206, ¶ 4, 744 P.2d 190, 191–92. This proposition is denied.

FN18. Evidence relating to both aggravating circumstances was presented in the guilt stage of trial, and that evidence was formally incorporated into the punishment stage. In fact, the punishment stage evidence was essentially limited to victim-impact and mitigation witnesses.

Pavatt, 159 P.3d at 293-94.

Asserting that the OCCA's decision is an unreasonable determination of the facts,

Petitioner claims that had the OCCA known "the woeful inadequacy of trial counsel's

investigation" based on "additional outside the record evidence," it would have equated this comment by trial counsel as "a flag of surrender." Petition, p. 210; Reply, p. 132. The fallacy of this argument is ever apparent. The OCCA cannot be faulted for unreasonably determining facts based on evidence *outside* of the record. See 28 U.S.C. § 2254(d)(2) (the determination of whether a decision is an unreasonable determination of the facts is made "in light of the evidence presented in the State court proceeding"). The OCCA examined the comment in light of the trial record, and Petitioner has not shown that its decision to deny relief is based on an unreasonable determination of the facts or an unreasonable application of Strickland.

Regarding the comment made by a mitigation witness, Respondent correctly points out that the substantive claim to the witness's comment was raised and rejected by the OCCA on direct appeal. See Pavatt, 159 P.3d at 293. However, the issue of trial counsel's ineffectiveness with respect to the witness's comment is unexhausted because it was not presented on direct appeal or in Petitioner's original application for post-conviction relief. Response, p. 176. Petitioner makes no mention of this claim in his Reply. Because it is clear that Petitioner has never presented this claim to the OCCA and because presentation of the claim now in a third post-conviction application would be undoubtedly barred, the Court finds that it is subject to an anticipatory procedural bar. Lott, 705 F.3d at 1179.

### 2.   Appellate Counsel Ineffectiveness.

Aptly describing Petitioner's appellate counsel claim as a "laundry list," Respondent asserts that to the extent these claims were not otherwise effectively argued in connection

with other presented grounds for relief, this Court should decline to review these claims due to their inadequate and cursory presentation.  Respondent, pp. 177-78.  The Court is wholly in agreement.

Petitioner's list of appellate counsel errors includes such vague references as "failed to raise the error in the admission of irrelevant evidence," "did not identify all the prosecutorial misconduct that there was," "failed to raise issues relating to evidentiary foundations of evidence," and "failed to conduct any investigation or interview any potential witnesses."  Petition, p. 211.  In his Reply, Petitioner's counsel asserts that "[i]t is not necessary to separately analyzed [sic] direct appeal counsel's failures when they have been set forth in relationship to the claims presented separately, and adopted from the arguments presented to the state by post-conviction counsel."  Reply, p. 145.  While the Court agrees with Petitioner (and Respondent) on the first point, the Court rejects Petitioner's second assertion that his bullet points of error constitute sufficient pleading.[50]  The Court declines to pour over the state court record in an attempt to discern what irrelevant evidence appellate counsel failed to object to, what additional prosecutorial misconduct claims could have been raised, what further investigation could have been conducted, etc.

As repeatedly noted herein, under the AEDPA, Petitioner bears the burden of establishing his entitlement to relief, and with respect to ineffectiveness claims, this burden

---

[50] Despite the assertion that these errors are adopted from arguments presented in state post-conviction proceedings, there is not a single citation to the state court record in support of this ground for relief.  Petition, pp. 210-12.

is exponentially increased. Therefore, to the extent Petitioner has effectively presented allegations of appellate counsel ineffectiveness within his other fourteen grounds for relief, they have been appropriately addressed herein.  However, regarding the snippets of appellate counsel errors set forth in his Ground Fifteen, the Court declines to address them as they fall woefully short of acceptable presentation, especially in light of the AEDPA standard and Petitioner's representation by appointed learned counsel (who, with the exception of this ground for relief, have presented Petitioner's request for habeas relief with an overabundance of argument and authority in a 216-page Petition and a 146-page Reply).[51] Richie v. Sirmons, 563 F.Supp.2d 1250, 1313-14 (N.D. Okla. 2008) ("Petitioner's cursory treatment of his general claim of ineffective assistance of appellate counsel provides no basis for an analysis by this Court.  Generalized allegations are insufficient to establish a violation of a constitutional right."). Cf. Lockett, 711 F.3d at 1230 (quoting Bronson v. Swensen, 500 F.3d 1099, 1104 (10th Cir.2007), "'[W]e routinely have declined to consider arguments that are not raised, or are inadequately presented, in an appellant's opening brief.'"); Hooks, 689 F.3d at 1173 n.12 (same); LaFevers v. Gibson, 182 F.3d 705, 725 (10th Cir. 1999) ("We have

_____

[51] This leads the Court to believe that Petitioner's counsel has determined that these appellate counsel claims are not among Petitioner's stronger grounds for relief.  Cf. Smith v. Murray, 477 U.S. 527, 536 (1986) (quoting Jones v. Barnes, 463 U.S. 745, 751-52 (1983), for the proposition that "the hallmark of effective appellate advocacy" is the "process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail."). The Court notes that since the filing of Petitioner's case, the Court has established page limitations for capital habeas cases.  See General Order 10-1. A beneficial byproduct of this order will be the necessity of habeas counsel to winnow through a petitioner's claims.

repeatedly warned litigants that issues adverted to in a perfunctory manner and without developed argumentation are deemed waived on appeal.").

**3.     Conclusion.**

For the reasons set forth above, the Court finds that Petitioner has failed to establish his right to relief.  Accordingly, Ground Fifteen is denied.

## V.  Motions for Discovery and Evidentiary Hearing.

With respect to Grounds One, Four, Five, Seven, and Fifteen, Petitioner has made requests for both discovery and an evidentiary hearing.[52]  Docs. 43 and 55. With due consideration of these motions, along with the multiple responses, replies, and further supplemental pleadings which have been filed with respect thereto, the Court denies the requests because, as fully discussed herein, they are not necessary to the Court's resolution of these five grounds.

Regarding discovery, "[a] habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course."  Bracy v. Gramley, 520 U.S. 899, 904 (1997).  Thus, Rule 6(a) of the Rules Governing Section 2254 Cases in the United District Courts provides that discovery may be permitted in a habeas proceeding only upon a showing of "good cause."  As the Supreme Court acknowledged in Bracy, Rule 6 is meant to be consistent with Harris v. Nelson, 394 U.S. 286 (1969).  Id. at 909.  In Harris, the Supreme Court held that adequate inquiry should be permitted "where specific

---

[52] Although Petitioner originally sought an evidentiary hearing with respect to Ground Nine, he effectively withdrew that request in his reply.  Doc. 78 at 6-7.

allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is confined illegally and is therefore entitled to relief. . . ." Harris, 394 U.S. at 300. See Wallace v. Ward, 191 F.3d 1235, 1245 (10th Cir. 1999) (citing Bracy); LaFevers, 182 F.3d at 723 (citing Harris and Bracy). Moreover, "[t]he purpose of an evidentiary hearing is to resolve conflicting evidence." Anderson v. Att'y Gen. of Kansas, 425 F.3d 853, 860 (10th Cir. 2005). Thus, if there is no conflict, or if the claim can be resolved on the record before the Court, then an evidentiary hearing is unnecessary. Id. at 859.

With respect to Ground One, Petitioner's pretrial publicity claim, Petitioner requests an evidentiary hearing "to establish the frequency, nature, and content of the publicity which occurred in the print and electronic media between the change of venue hearing [held in January 2003] and the time of [his] trial [which began in August 2003]." Petitioner contends that "[t]his evidence will establish the impact these stories . . . must have had upon the jury deciding his case." Doc. 55 at 2. In order to obtain this evidence, Petitioner also requests a subpoena directed to "media sources serving Oklahoma County." Doc. 43 at 7. As discussed in both Ground One and Ground Fifteen (in connection with a related trial counsel ineffectiveness claim), supra, voir dire confirms that despite the pretrial publicity, an impartial jury was selected to hear Petitioner's case. A review of the media produced in the months preceding the trial will have no impact on this well-supported record determination.

With respect to Ground Four, Petitioner's claim that he was denied the right to present a defense by the trial court's exclusion of third-party perpetrator evidence, Petitioner seeks

108

the opportunity to depose the prosecutor, Fern Smith, and Mr. Wood, the alleged third-party perpetrator, about Mr. Wood's confession. In related claims, Petitioner also seeks subpoenas to obtain "[a]ny information known to the Oklahoma County District Attorney's Office, Oklahoma City Police Department, Oklahoma County Sheriffs's Office, or the FBI, that [1] [Petitioner] did not shoot and kill Rob Andrew . . . [and] [2] that [Mr. Wood], Brenda Andrew or some person other than Petitioner shot and killed Rob Andrew. . . ." Doc. 43 at pp. 7-8. Finally, Petitioner requests an evidentiary hearing to "present the testimony of [Mr. Wood], the letters that he authored, and the testimony of Detention Officer Holisak who maintains [Mr. Wood] wrote the letters and confessed to the homicide of Rob Andrew." Doc. 55 at 3. For the reasons discussed in Ground Four, <u>supra</u>, the Court finds the information Petitioner seeks to obtain and present is simply more of the same information which was deemed insufficient to support admission of the evidence. Petitioner still fails to offer any corroborating evidence for Mr. Wood's confession. Moreover, the Court finds that Petitioner's requests to obtain any information known by law enforcement agencies that he did not kill Rob, and who instead may have done it, are best characterized as fishing expeditions which the Court will not permit. <u>Teti v. Bender</u>, 507 F.3d 50, 60 (1st Cir. 2007) ("A habeas proceeding is not a fishing expedition." ); <u>Hill v. Johnson</u>, 210 F.3d 481, 487 (5th Cir. 2000) (noting that Rule 6 is not meant for fishing expeditions and that "factual allegations must be specific, as opposed to merely speculative or conclusory").

With respect to Ground Five, Petitioner's claim that his appellate counsel was ineffective for failing to raise claims on appeal regarding the State's handwriting expert,

Petitioner seeks an evidentiary hearing to "present testimony concerning the unreliability and lack of empirical support for handwriting identification . . . [and] that there was no strategic reason for failure to raise the issue on direct appeal." Doc. 55 at 4. In the adjudication of Petitioner's Ground Five, the Court found that the OCCA did not unreasonably apply Strickland to find that appellate counsel was not ineffective in this instance. In denying Petitioner's claim, the OCCA found Petitioner had failed to show that he was prejudiced by appellate counsel's omission of the claims in the absence of controlling authority that would have prevented admission of the evidence. Therefore, even if Petitioner were to demonstrate that appellate counsel had no strategic reason for omitting the claims, such demonstration would relate only to the issue of deficient performance. Because the OCCA assumed deficient performance and denied Petitioner's claim due to a lack of prejudice, the purposes for which Petitioner seeks an evidentiary hearing on this claim both are collateral and unnecessary to the adjudication of Petitioner's Ground Five.

With respect to Ground Seven, Petitioner seeks both discovery and an evidentiary hearing regarding his second allegation of prosecutorial misconduct labeled "Use of Bullet Evidence." Petition, pp. 105-10; Doc. 55 at 4-5; Doc. 43 at 7-8. Because the Court has procedurally barred this claim due to Petitioner's failure to present it to the OCCA until his second post-conviction application, neither discovery nor an evidentiary hearing is warranted on this claim.

With respect to Ground Fifteen, Petitioner seeks an evidentiary hearing on the issue of trial counsel ineffectiveness. Doc. 55 at 6-8. Petitioner's initial request is that he be

granted an evidentiary hearing to make a general showing that his trial counsel lacked the qualifications and experience to serve as qualified counsel. However, Petitioner has failed to show why an evidentiary hearing is needed to present this evidence and how it is relevant to any particular claim of ineffectiveness raised.[53]  Irrespective of how many capital defense seminars trial counsel may have attended or how many capital cases he may have previously tried, the question under Strickland is whether trial counsel rendered deficient performance in Petitioner's trial and if so, whether it resulted in prejudice to Petitioner. There is no per se rule of ineffectiveness based on an attorney's qualifications and experience. But see United States v. Bergman, 599 F.3d 1142, 1148 (10th Cir. 2010) (" adopt[ing] a *narrow* per se rule of ineffectiveness where a defendant is, unbeknownst to him, represented by someone who has not been admitted to any bar based on his 'failure to ever meet the substantive requirements for the practice of law'") (citation omitted).

Petitioner's remaining requests with respect to his Ground Fifteen relate to his first, second, and eighth allegations of trial counsel ineffectiveness. Petition, pp. 188-95, 199-211 (wherein Petitioner has alleged that his trial counsel was ineffective with respect to his confession letter, the bullet evidence, and in the investigation and presentation of his mitigation case). Because the Court has procedurally barred these claims due to Petitioner's failure to present them to the OCCA until his second post-conviction application, an evidentiary hearing on these claims is clearly unwarranted.

---

[53] The Court notes that Petitioner has made a similar request with respect to his appellate counsel in a supplemental motion. Doc. 85. It is likewise denied.

## VI.  Conclusion.

After a thorough review of the entire state court record, the pleadings filed herein, and the applicable law, the Court finds that Petitioner is not entitled to his requested relief. Accordingly, Petitioner's Petition (Doc. 49), motion for discovery (Doc. 43), and motion for an evidentiary hearing (Doc. 55) are hereby **DENIED**.  A judgment will enter accordingly.

IT IS SO ORDERED this 1st day of May, 2014.

DAVID L. RUSSELL
UNITED STATES DISTRICT JUDGE